CREATIVE ENVIRONMENTS, INC., et
al., Plaintiffs, Appellants,

v.

Robert ESTABROOK, et al.,
Defendants, Appellees.

No. 81–1476.

United States Court of Appeals,
First Circuit.

Argued Dec. 11, 1981.

Decided May 6, 1982.

Rehearing and Rehearing En Banc
Denied June 15, 1982.

Edward P. Leibensperger, Boston, Mass., with whom Patricia S. Nelson, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for appellants.

J. Christopher Robinson, Boston, Mass., with whom Edward R. Lev, Boston, Mass., Thomas M. Zimmer, Concord, Mass., and Sullivan & Worcester, Boston, Mass., were on brief, for appellees Environmental Research and Technology, Inc. and Scott McCandless.

Joan A. Lukey, Boston, Mass., with whom J. Owen Todd, Jane D. Kaplan, and Hale & Dorr, Boston, Mass., were on brief, for appellees Robert R. Estabrook, et al.

Before CAMPBELL and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Creative Environments, Inc. ("CEI") and its president, Wayne E. Barber, appeal from the granting of summary judgment in favor of defendants Town of Bolton, Massachusetts, certain town officials, Environmental Research & Technology, Inc. ("ERT"), and Scott McCandless, an employee of ERT and a Bolton resident. CEI had sued all defendants except the town on February 5, 1976, charging a conspiracy to deny CEI its constitutional rights in connection with the Bolton Planning Board's rejection of a residential housing development promoted by Barber and CEI. As later amended, the complaint alleged violations of 42 U.S.C. §§ 1983, 1985(3), and 1986 and sought declaratory and injunctive relief as well as compensatory and punitive damages against all defendants. The Town of Bolton was added as a defendant in 1978.

After four years of discovery, the defendant officials, ERT, and McCandless moved for summary judgment. When considering the motion, the district court had before it affidavits, answers to interrogatories, and extensive depositions. It allowed the motion on June 17, 1980. 491 F.Supp. 547. On June 18, the Town of Bolton similarly moved for summary judgment. This motion was allowed on November 20, 1980 and final judgment was entered on June 2, 1981. This appeal followed. We agree with the district court that there was no triable issue and that movants were entitled to judgment as a matter of law.

I.

We set forth the facts of record at considerable length, taking pains to include in our narration those which tend to favor plaintiffs' claims.

CEI was incorporated by Wayne Barber in March 1971 for the purpose of constructing and developing residential housing. Prior to 1973 CEI had engaged in only limited development work, its primary project having been a 24-unit condominium in Walpole, Massachusetts. In February 1973, Barber became interested in a piece of property in the Town of Bolton known as Appleton Ridge. Bolton is a small town in central Massachusetts which, according to census data, had a 1980 population of some 2,530 persons. After making preliminary inquiries and acquainting himself with Bolton's zoning bylaws and the town's rules and regulations governing the subdivision of land, Barber purchased, in October 1973, some 183 acres for $177,000. Though CEI had never developed any subdivisions before, Barber's plan was to build an 80-unit housing subdivision composed of three and four home "clusters." Each cluster of houses was, according to Barber's plan, to be surrounded by a large area of open space,[1] and each cluster would share common services such as water and sewer. The land surrounding a cluster was to be left in its natural wooded state. The cluster configuration was an important part of Barber's

---

* Of the District of Massachusetts, sitting by designation.

1. Only 84 of the 90 homes were to be built on land within the Bolton town limits. The other six were to be built on areas in Appleton Ridge which fell within the boundaries of the neighboring town of Stow. The issues in this case are related only to the 84 homes—to be built in 21 clusters—within the Town of Bolton.

concept for the subdivision. To satisfy the Bolton zoning requirement that individual single family homes be built on separate lots of at least 1.5 acres, Barber drew the lot lines around each home within a cluster in an unconventional, irregular shape. These lots preserved Barber's preference for having homes within a cluster close together and complied with at least the letter of the zoning rule, which had no express sideline specifications in addition to its requirement that each individual home have 1.5 acres surrounding it. Barber also hoped to provide common facilities such as a pool and community building for the use of the entire subdivision. He intended that each homeowner would own, in addition to his house, an interest in these facilities, and that owners would automatically become members of an association which would govern the use and maintenance of these common areas.

On December 4, 1973, in accordance with Massachusetts subdivision laws, Mass.G.L. c. 41, § 81S, CEI filed a preliminary plan for the Appleton Ridge subdivision with the Bolton Planning Board.[2] On February 1, 1974, the Board disapproved this plan by unanimous vote. As reasons for disapproval, the Board noted that the plan provided for at least six dead-end streets which had not, as was required by the town bylaws, been previously approved by the Planning Board. The Board also stated that several lots lay across an approved town way "for which no legal abandonment has been approved nor has any relocation been approved." Several roads were found to have grades in excess of the allowed maximum of six percent, with insufficient "leveling areas," and the irregular lots were found to be "not in compliance with the intent of the town by-laws." The Board attached a report from the Bolton Board of Health, which also disapproved the plan, and noted that insufficient data on such matters as

water holes, recreation areas, open space, utilities and street designs had been provided. Finally, the Board noted that no financial arrangements or conditions had been presented or discussed.

Barber took no exception to this disapproval but rather set about the task of preparing a "definitive plan" for the Appleton Ridge subdivision. Under Massachusetts law, the Board would be required to approve such a definitive plan so long as it complied with Bolton's zoning laws and the Board's own "reasonable" rules and regulations. Mass.G.L. c. 41, § 81M. One such Board regulation, which was in effect at the time Barber purchased Appleton Ridge, stated that, as a condition of approval, land developers were to file with the Planning Board "Environmental and Financial Impact Studies endorsed by a professional Planning Engineer which demonstrates that all available alternatives have been explored and evidence is provided that the plans submitted represent the best interest of the Town." Board Regulation 3.3.1.28. No standards or criteria were provided in the regulation, or elsewhere, as to how this condition might be satisfied. Moreover, there was apparently some dispute among Board members and citizens regarding the rule's validity under state law. Scott McCandless, in particular, believed that the regulation was not valid.

Nevertheless, on March 11, 1974, in an attempt to comply with this requirement, CEI submitted to the Board a 33-page study prepared by Charles E. Downe Associates entitled, "Response to Section 3.3.1.28 of The Bolton Subdivision Regulations." CEI heard nothing from the Board regarding this submission, however, and on July 30 CEI filed its full "definitive plan" with the Planning Board.

Unlike its preliminary plan, the definitive plan did not show lines breaking up each cluster into irregular lots. Rather, in an

---

2. The Planning Board at this time was made up of Robert R. Estabrook (Chairman), Thomas Murphy, Berneda A. Serfass, and Bordon E. Slater. These officials—with the exception of Thomas Murphy, who died during the course of the litigation—are all defendants in the present

action. Other named town officials who are defendants in this case include Planning Board members Fischer and Kelley, Town Counsel Hill, the Board of Selectmen, the town's Law Committee, and the seven members of the Conservation Commission.

effort to defuse the 1.5 acre zoning issue, CEI designed the new plan to show only five large parcels divided by the proposed public ways. It was apparently understood by both Barber and the Board that, once the entire subdivision concept was approved, CEI would submit for Board approval individual plans for each house in accordance with a special provision of the subdivision laws. *See* Mass.G.L. c. 41, § 81P.

On August 27, 1974, the Planning Board met with CEI to discuss Appleton Ridge in detail. After CEI had finished its presentation and had departed, the Board drafted a letter, which it sent the following day, to all the major town boards and officials informing them of the CEI proposal. In this letter the Board informed these officials that a meeting was being scheduled at Town Hall for September 7 "for a review of the Creative Environments, Inc. definitive subdivision plan." It further noted that a public hearing would be held on September 9 to formally discuss the plan and that all recommendations had to be in the Planning Board's hands by the 14th. The letter closed by saying, "It is imperative that the Town Boards get together this September 7 to study, discuss and fully understand the impact that this definitive plan will have on the Town of Bolton." No copy of this letter was sent to Barber or CEI, and no representative was present at the September 7 meeting. Indeed, when Barber asked a Board member on September 5 when the next Planning Board meeting would be held, he was told only that it would meet on the 9th for the public hearing. Both the September 7 meeting of town leaders and September 9 public hearing took place as scheduled.

A few days after the public hearing, on September 12, at least in part because the Board intended at that time to rely upon CEI's environmental report in reaching its decision on the subdivision, the Planning Board commissioned ERT to evaluate the CEI study. Board member Murphy originally approached Scott McCandless to assist in this evaluation. McCandless was a town resident, an urban affairs specialist for ERT and a part-time reporter who covered the Planning Board for a local newsletter called the "Bolton Citizen's News." McCandless declined Murphy's invitation, however, because he had been covering the subdivision story as a reporter and felt it might be improper for him to get directly involved. McCandless referred Murphy to ERT, his employer, however, even though he had long personally felt (and had so expressed himself to the Board) that the environmental study regulation was an *ultra vires* exercise of Board power under state law. Ultimately, despite his initial reluctance to get involved in the evaluation, McCandless briefed ERT on the subdivision plan once ERT agreed to perform the work. Indeed, at least one ERT employee who worked on the evaluation assumed that McCandless was heading up the project for ERT.

Toward the end of September, several relevant events took place in rapid succession. On September 21, ERT mailed to the Planning Board its essentially negative review of CEI's environmental study. Included in this review was ERT's view that "[c]ommon land ownership could foster a viable political group in a town such as Bolton[ ]" and that the social and political effect of the subdivision would be "significant." This review was apparently received by September 23 because Board member Murphy, at a meeting with CEI on that day, referred to an evaluation in his possession, though he said he had not read it and would not provide CEI with a copy. Also on September 23, Town Counsel Hill wrote to the Board, and in the context of a full critique of the CEI plan, suggested that the environmental study regulation was a valid ground upon which to approve or disapprove the plan. He altered this opinion the very next day in another letter, however, and specifically advised the Board on the 24th *not* to rely upon the CEI environmental study in its final decision.

On September 25, 1974, the Board met, voted separately on a number of distinct issues, and drafted a nine-page letter disapproving CEI's definitive plan. In this letter

the Board listed seven separate reasons for its disapproval. These included 1) that the plan's proposed one-million gallon reservoir and dam were not detailed with sufficient specificity to insure public safety; 2) that the dam had not been approved by the Commissioner of Public Works; 3) that "the developer has not presented the Board with easement information as required under regulation 3.3.1.27"; 4) that Road G, a main access road for the subdivision, extended for nearly 1,000 feet into an area zoned for industrial use, in violation of regulation 2.3.11.1; 5) that the plan lacked detailed information on the control of groundwater; 6) that the plan lacked sufficient construction details in nine enumerated categories; and 7) that eight specific areas "are inadequately shown/described on the drawings and require further clarification." After each of these reasons, which were voted on separately at the Board meeting when the plan was disapproved, the Board recited that "for these reasons the Board has voted to disapprove the plan and does so disapprove." The issue of the CEI environmental study was raised at the beginning of the meeting but, according to the minutes of that meeting, "no action" was taken on a suggestion to disapprove the plan because of the study's inadequacy. At the end of the meeting, however, the Board voted to include a final paragraph in the letter which was not accompanied by the "disapproval" recital. This paragraph reads as follows:

> The Environmental Plan AR–59 which uses data that is not current draws subjective conclusion [sic] with a method that is questionable, and was written for a previously submitted preliminary plan, not the filed definitive plan. The Board considers this document unacceptable.

Following this rejection, on October 16, CEI filed a timely state court action pursuant to Mass.G.L. c. 41, § 81BB to obtain a review of the Board's decision.[3] In its state court complaint, CEI apparently asserted that the Board had illegally relied upon the environmental study requirement in rejecting its plan. In reply, the Board denied that "it exceeded its authority and denies it was in error as a matter of law and fact for the reasons given, i.e., the environmental plan document is unacceptable and further answers by reference to its decision. . . ." Soon after this suit was filed, the town held hearings and approved, on November 26, 1974, a new zoning bylaw which prohibited the types of irregular lots contained in CEI's preliminary plan.[4] At Planning Board meetings on January 27 and 29, 1975, it was suggested by Board member Murphy and Town Counsel Hill that this new regulation might be applied to CEI's plan, but no such action was ever taken by the Board.

The state court proceeding, with the express agreement of CEI, ultimately bypassed the matter of the environmental study and focused upon a single issue relating to the preservation of open space in the development. This issue had been the subject of a series of separate, but simultaneous developments in the spring and summer of 1974.

As part of its effort to comply with Bolton's subdivision rules, CEI engaged in discussions with the town Conservation Commission over the issue of open space in Appleton Ridge. Planning Board Regulation 4.4 required that "before approval of a plan," the Commission had to approve an open space provision which "unless otherwise specifically approved by the Planning Board," reserved at least ten percent of the subdivision for park and playground use. Such a requirement is authorized under

---

3. In the normal course, the state subdivision law prohibits a town from applying any new zoning ordinances or bylaws to a subdivision plan once a preliminary plan is filed. The filing of a state suit appealing a disapproval of a definitive plan preserves these rights and stays the application of any new ordinances "pending an order or decree of a court of final jurisdiction." Mass.G.L. c. 40A, § 7A.

4. Because of CEI's state lawsuit, this new bylaw could apparently not be applied to CEI's plan until after an order or decree by a state court pursuant to Mass.G.L. c. 40A, § 7A (as in effect prior to St.1975, c. 808, § 3; see now Mass.G.L. c. 40A, § 6, para. 6). See note 3, supra.

Mass.G.L. c. 41, § 81U. The Commission had advised the Board in January 1974 to disapprove CEI's preliminary plan for lack of compliance with Regulation 4.4. On July 23, 1974, Barber met with Robert Held, chairman of the Commission. Held expressed dissatisfaction with the limited scope of Regulation 4.4 and requested that Barber increase the amount of open space reserved for parks. He further asked that CEI grant this open space to the town in perpetuity and at no cost to Bolton. Although such a requirement, had it been unilaterally imposed by the Planning Board as a condition for approval, would apparently have violated state law, see Mass.G.L. c. 41, § 81Q,[5] the subdivision laws do not expressly proscribe the type of voluntary negotiations which Held entered into on behalf of the Conservation Commission. Barber replied that he would "not object to the [additional] Conservation Commission requirements provided that the definitive plan was approved by the Planning Board substantially as submitted on July 30, 1974 with the waivers requested therein." Held said that neither he nor the Commission could control the decision of the Board, but he suggested that CEI and the Commission enter a side agreement contingent upon favorable Board action. Barber agreed and Held drafted a letter of agreement. This arrangement was finally consummated in a letter of intent sent by Barber on September 13. This letter stated that "Whereas the Bolton Conservation Commission ... desires an Open Space Plan with requirements other than those required under Regulation 4.4 ... and whereas Creative Environments, Inc. ... agrees in principle to comply with these additional requirements ...," CEI would grant some 38 acres of open space to the Commission in perpetuity for nominal consideration provided the definitive plan is "approved substantially in the form submitted...." The Commission approved CEI's open space plan on September 17. While the Board was informed of

the negotiations between CEI and the Commission, its disapproval of the definitive plan on September 26 made no mention of the open space issue. Nor did the plan itself designate any open space as being transferred to the Commission. In a revised plan submitted on December 5, 1974, however, CEI included a revised open space drawing which reflected the side agreement and labelled the designated areas as reserved to the Commission.

On January 30, 1975, the Board voted to accept the December 5 plan, including the open space proposal, subject to several conditions. It voted to reject, however, several very important waiver requests which were understood by Barber to have been in the plan from the outset. Because of the Board's failure to enact the plan as submitted on December 5, specifically its failure to grant a waiver respecting road "G," CEI decided to withdraw its offer to grant the open space in perpetuity—and instead reduced the terms of the grant to three years, the maximum term which the Board could unilaterally demand under state law. Mass.G.L. c. 41, § 81Q. CEI formalized this change in its proposal on February 17, 1975, in a letter to the Board. CEI submitted a revised open space drawing on March 10. At a March 10 Planning Board meeting, member Murphy again indicated his displeasure with CEI's refusal to comply with the new lot line regulations, but on March 11 Town Counsel Hill wrote to the Board that the regulation could not be applied to CEI's plan.

On March 20, 1975, after discussions among the Board, Conservation Commission chairman Held, and members of the "Law Committee," the Board again approved the CEI plan but added the express condition that CEI include in its plan the full land grant "[a]s offered by the developer in his letter of intent...." The Board also expressed the desire, although this was expressly captioned as "not a condition for

---

**5.** Mass.G.L. c. 41, § 81Q provides that "No rule or regulation shall require, and no Planning Board shall impose, as a condition for the approval of a plan of a subdivision, that any of the land within said subdivision be dedicated to the public use ... without just compensation to the owner thereof."

approval," that CEI comply with the November 26, 1974 zoning ordinance forbidding irregular lots.

CEI immediately brought the March 20 approval conditions to the attention of the state court where its appeal was filed, and on April 10 and 11, 1975, CEI's state court proceeding went to trial with the sole issue being whether the town's March 20 insistence on the open space issue was legal under the state subdivision law. On April 22, the Massachusetts superior court issued findings and an order. As part of its ruling, the court stated,

> I FIND that the plaintiff and defendants have both conducted extensive negotiations and meetings from the inception of the application in October of 1973. The plaintiff has modified and revised various portions of their original plan of July 1974 pursuant to the Board's September disapproval. The modified plan submitted by the plaintiff in December increased the open area acreage from 19 acres to 38 acres. This modified plan was conditionally approved by the Board in January of 1975. However, the plaintiff's attempt to satisfy the conditional approval resulted in a substantial modification of the use and distribution of the open space which had been conditionally approved by the Board. Therefore, at this point, there is no way to determine what amount of land the plaintiff is willing to designate as open space without the submission of a new plan, not a revised original.

> Accordingly, this matter is ordered remanded to the Planning Board for definitive action. The plaintiff should submit a plan designating what acreage is to be open space pursuant to G.L. Ch. 41, Sections 81K–81GG. Thereafter, the Planning Board should either approve or disapprove of this plan pursuant to the applicable sections of G.L. Ch. 41.

Soon after the case was remanded it became apparent that it was susceptible to two rather different interpretations. While CEI read the order as requiring only a new "open space" plan, it learned that the Board might interpret the opinion as requiring an entirely new *subdivision* plan, "not a revised original." This, in turn, would arguably subject CEI to the new zoning bylaw outlawing irregular lots and defeat the "cluster" concept. CEI, therefore, filed, on April 29, a motion for a new trial in which it argued that "[t]he submission of a new subdivision plan by the Plaintiff will cause the Plaintiff irreparable harm, financial and otherwise, as a result of the attendant time delays and will require the Plaintiff to conform its new subdivision plan to zoning and Planning Board rule and regulation changes which have occurred in the interim . . . ." This motion was argued on May 8 to the trial judge and denied on June 24, 1975, *nunc pro tunc* as of May 8, 1975.

Soon thereafter, CEI submitted to both the court and the Board on May 14, 1975, copies of previously submitted open space plans with revisions marked in red which were unaccompanied by "a new subdivision plan." In response, the assistant clerk of the state court wrote CEI on May 16 that the case had been remanded to the Board and that the court "did not retain jurisdiction." On June 17, after meeting in executive session several times, the Board sent a "resolution" to CEI indicating that it was requiring, as per court order, "a new subdivision plan (linen and eight prints) not a revised print or revised original . . . ." CEI never complied with this request. Instead, on June 27, CEI filed a motion for contempt in state court alleging that this latest Board action was in defiance of the court's decision. On July 22, plaintiffs filed a notice of appeal with the state court seeking review of both the April 22 decision and the June 24 denial of a new trial.[6] In early August

---

**6.** While it is uncertain whether the state court's order remanding the case to the Planning Board would have constituted a "final judgment" under applicable state law, *see* Mass.R. Civ.P. 54(a) (requiring final adjudication of rights of the parties), the order denying the new trial might have been appealable and subject to review for abuse of discretion or error of law provided the ground for granting the new trial arose for the first time on the motion. *See Moran v. Pieroni*, 326 Mass. 516, 95 N.E.2d 296 (1950).

CEI's counsel inquired about his contempt motion with a clerk of the court where the state trial judge was sitting. That clerk informed counsel that the trial judge had stated "he was finished with the CEI case and that he would not hear any further motions with respect to the case." On October 21, CEI moved to withdraw its state court appeal. This motion was granted. On February 3, 1976, CEI and Barber filed the present district court action alleging violations of 42 U.S.C. §§ 1983, 1985(3) and 1986.[7]

## II.

CEI and Barber contend in the present action that defendants denied them a fair hearing, measured the CEI plan against unconstitutionally vague and subjective standards, and generally "distorted" the Massachusetts subdivision laws in order to block the Appleton Ridge development. Plaintiffs say that under state law a developer whose plan comports with a town's *reasonable* regulations and bylaws is entitled as of right to Planning Board approval. Mass.G.L. c. 41, § 81M. Here, they contend, their plan was disapproved for such improper reasons as that town officials feared its social effects upon the community and the political threat posed by the proposed homeowners' association. The town officials' asserted failure to deal "objectively" with the plan is said to have amounted to a deprivation under color of state law of rights secured by the Constitution, to wit, the right not to be denied property without due process, and thus to have violated 42 U.S.C. § 1983. Plaintiffs also contend that defendants conspired to discriminate against CEI in violation of 42 U.S.C. §§ 1985(3) and 1986, this conspiracy resulting from an invidious, class-based animus against those people who might someday belong to the homeowners' association.

*Section 1983*

In considering whether CEI and Barber, who oppose summary judgment, have demonstrated a genuine issue of material fact, we look at the affidavits, depositions and other supporting papers in the light most favorable to them, *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Gual Morales v. Hernandez Vega*, 579 F.2d 677 (1st Cir. 1978), making all legitimate inferences in their favor. *Ferguson v. Omnimedia, Inc.*, 469 F.2d 194, 198 (1st Cir. 1972). We shall assume that CEI and Barber could have established at trial that the town engaged in adversarial and even arbitrary tactics with respect to the CEI plan. Especially with respect to the town's insistence that CEI submit an entirely new subdivision plan after the state court required only "a plan designating what acreage is to be open space . . . ," an inference might be warranted that the Planning Board was seeking to frustrate CEI's efforts to develop its subdivision. We further assume that plaintiffs could persuade a trier of fact that had CEI proposed a more modest plan with conventional lot lines, the path to Board approval would have been smoother. Nevertheless, we still do not believe that plaintiffs can demonstrate that the Board's actions rose to the level of a violation of the Constitution of the United States.

■ First, with respect to procedural due process, the facts in the record, viewed most favorably to plaintiffs, do not show that CEI was denied, as plaintiffs insist, "its right to a fair and meaningful hearing process." CEI was allowed a full public hearing on the plan. In addition, the Board met with CEI on at least 11 occasions prior to the September 26 disapproval and nine additional times after that date. Each official action by the Board was accompanied by a full statement of reasons. CEI had and

---

7. Between the time CEI withdrew its state court appeal and filed its federal action, the Planning Board adopted a new regulation raising the filing fee for subdivision plans. CEI would be adversely affected by this regulation if forced to submit an entirely new subdivision plan—indeed its original $75 fee would be increased to some $19,856—but CEI does not here separately challenge the regulation. It does assert, however, that the size of the fee—which was set to help the town defray its costs in processing plans—is further proof that the town intended to enforce its environmental study regulations.

exercised its right to state court review of one of the Board's actions. Additional judicial review in the Massachusetts courts would seemingly have been available had CEI so elected. CEI points to the fact that it was not invited to seven meetings of town officials—including several Planning Board executive sessions—over the period from August 1974 to July 1975. The special meeting of town leaders on September 7 just prior to the September 9 public hearing is of particular concern to CEI. But the due process clause does not require that CEI be invited to attend such meetings. Administrative and governmental bodies are not constitutionally required to forego executive sessions. Nor are members of such organizations forbidden by due process from speaking periodically to one another and other leaders regarding the matters pending before them. Some 21 meetings, including a full public hearing and a state court appeal, were accorded the plaintiffs. CEI and Barber received at least the minimal process due them under the Constitution. *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To hold that more or better hearings were required would be to place an unreasonable burden on the town.

■ Plaintiffs would also have us find a denial of due process in the disapproval of their plan for noncompliance with what are said to be vague and unclear standards. They contend that Board Regulation 3.3.1.-28, which required developers to submit an environmental plan showing that a proposed development was in the "best interests of the town," placed "virtually unfettered discretion" in the hands of public officials. *See White v. Roughton*, 530 F.2d 750,

754 (7th Cir. 1976). Assuming without deciding, however, that an issue of constitutional dimension would be raised were such a regulation to be the sole, or at least a major, basis for denying an application such as this one, plaintiffs have not established any likelihood of showing that Regulation 3.3.1.28 played any such key role. Plaintiffs are entitled to all inferences which are fairly supported by the evidence, but are not permitted to build their case on mere "opprobrious epithets" of malice, *see Snowden v. Hughes*, 321 U.S. 1, 10, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1943), or "the gossamer threads of whimsey, speculation and conjecture." *White v. The Hearst Corp.*, 669 F.2d 14, 19 (1st Cir. 1982), *quoting Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir. 1962). CEI has pointed to little beyond its speculations to show that the challenged regulation was critical to disapproval of CEI's plan.

The Board letter rejecting the preliminary plan makes no mention of the challenged regulation. The September 26 disapproval of the definitive plan lists seven precise grounds of disapproval, each one of which is followed by the statement "for these reasons the Board has voted to disapprove and does so disapprove." The last two sentences of the Board's letter to CEI mentions the proffered environmental study and describes it as "unacceptable," but these sentences were included only after the Board had expressly voted to take "no action" on a proposal to cite the CEI study as a reason for disapproving the plan. There is thus no suggestion, express or even implied, that this regulation was the reason the Board turned CEI's plan down in September.[8] Moreover, CEI does not dispute

8. Plaintiffs refer us to a number of statements in the record, such as the Board's answer to CEI's complaint in the state court proceeding and various statements by Board members, which are claimed to be admissions on the part of various defendants that this regulation played a central role in the denial of CEI's September submission. We have examined these and find that they reflect, at most, a running disagreement among various Board members concerning the validity of the regulation. There is no evidence that that regulation

was actually dispositive to the Board's decision, while such evidence as there is supports the view that the Board expressly decided *not* to condition their approval or disapproval of the plan on CEI's study on several occasions.

The closest plaintiffs come to raising an issue of fact on the question is a cryptic answer by Planning Board member Fischer to a rather involved question put to him by CEI's counsel during a 1975 deposition. This exchange was as follows:

the fact that the Board asserted at least several perfectly valid grounds in its September letter for disapproving the plan in addition to its mention of the CEI study. On January 29, 1975, the Board voted 3–2 *not* to require a new environmental study from CEI as a condition for acceptance of the approved plan, and finally, in its March 20 communication with CEI and in its June requirement of a new plan, the Board mentioned neither the regulation nor any environmental study. In these circumstances, and lacking some tangible indication that Regulation 3.3.1.28 was in fact a dispositive ground for disapproval, we think the regulation raises no issue of constitutional moment in this case. We thus affirm the district court's grant of summary judgment as to this issue.

CEI finally asserts that its right to due process was violated by the town's overall "distortion of the existing statutory and regulatory scheme." This argument rests not on any failure to have provided adequate procedures, but on the alleged arbitrary misapplication of state law resulting, plaintiffs assert, in denying them their "right" to conduct a legitimate business and make a profit. Plaintiffs again point to the Board's vague environmental study regulation, discussed *supra,* as well as to the Board's positions on the open space question, its interpretation of the state court order to require an entirely new subdivision plan (and thus to require conformance with the new squared lot bylaw), and the raising of the filing fee for subdivision plans.

■   It is not impossible to derive a theoretical basis for CEI's argument from cases such as *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). But were such a theory to be accepted, any hope of maintaining a meaningful separation between federal and state jurisdiction in this and many other areas of law would be jettisoned. Virtually every alleged legal or procedural error of a local planning authority or zoning board of appeal could be brought to a federal court on the theory that the erroneous application of state law amounted to a taking of property without due process. Neither Congress nor the courts have, to date, indicated that section 1983 should have such a reach.

As support for its position that a "distortion" of state law triggers constitutional rights, CEI relies on cases either involving procedural due process or on cases where the official conduct at issue was significantly more egregious than that alleged here. In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), for example, cited by plaintiffs, the Supreme Court found that a nontenured state university professor whose contract was not renewed was *not* entitled to a hearing prior to termination because he had no property

Q  ... So I say if I comply with the zoning by-law as to use, as to side lines, setback area requirements, if I comply with all other known regulations in the Town of Bolton, what more must I do in order to comply with 3.3.128 [sic] under your regulation?
A  As I understand 3.3.128 [sic], it requests an impact study, an impact study that identifies alternatives for the use of that property or land or that which is to be impacted, and to indicate I would hope an objective comparison with respect to the relative value of each one of these alternatives.
Q  And once he's done that, has he complied with the by-laws?
A  Yes.
Q  But what if your board finds that he wasn't objective but was subjective, as you said in your letter of September 26th, you would then have the right, I take it, to disapprove the plan on failing to comply with that regulation, isn't that fair to say, which you did do?
A  That's right.
The answers of a single Board member to the above questions—all of which suggest a hypothetical situation rather than the actual motivation of the Board in deciding on CEI's plan—is not a sufficient showing when placed beside the actual text of the rejection letter and the Board's votes to raise an issue of fact as to whether the environmental study regulation played a dispositive role in the rejection of the plan. Nor does the Board's answer to CEI's state court complaint do more than merely reference the letter and the reasons for rejection stated therein. The district court, therefore, did not err in granting summary judgment on such a record. *Cf. Room v. Caribe Hilton Hotel,* 659 F.2d 5, 8 (1st Cir. 1981) (more than a mere scintilla of evidence required to overcome directed verdict).

interest under state law. Even assuming CEI had a property right here, however, we have already found that no procedural default took place. Moreover, *Moran v. Bench*, 353 F.2d 193 (1st Cir. 1965), *cert. denied*, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966), and *Progress Development Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961), also relied upon by CEI, are readily distinguishable. In *Moran*, this court affirmed a section 1983 summary judgment against a plaintiff who claimed to have been "arbitrarily" treated by the Massachusetts Registry of Motor Vehicles. We reached this result even though the officials in that case might have been "over-demanding." *Id.*, at 194.[9] The *Mitchell* case, meanwhile, involved racial animus, an equal protection fact pattern not presented in CEI's case.

Plaintiffs also cite to *Cordeco Development Corp. v. Santiago Vasquez*, 539 F.2d 256 (1st Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976). In *Cordeco*, another equal protection case, this court affirmed a section 1983 judgment against Puerto Rican officials who, the jury found, had improperly denied the plaintiff a permit to extract sand while granting such permits to a more influential, politically connected rival. The federal basis for liability in *Cordeco*, however, was never expressly litigated, *see id.*, at 260 n.5, and the facts of that case—involving officials favoring a politically powerful, wealthy businessman with a public license over a less influential but equally deserving competitor—are significantly different from the present case. *See* note 9. Here it is merely indicated that town officials are motivated by parochial views of local interests which work against plaintiffs' plan and which may contravene state subdivision laws. Apparently no rival developer advocating CEI's ambitious plan would have had more success than Barber. Plaintiffs would thus have us rule that the due process clause to

**9.** It is true that we stated in *Moran* that "if defendants [public officials] employed their official powers for the purpose of injuring the plaintiff, rather than to serve the proper ends of their governmental duties, plaintiff might well have a claim under the civil rights statutes." *Moran v. Bench*, 353 F.2d at 194. This was but general dicta, however, and even if it could here be shown that the Board members strayed wilfully from "the proper ends of their governmental duties," their digression was not of "constitutional proportions." *Crocker v. Hakes*, 616 F.2d 237, 239 n.2 (5th Cir. 1980) (per curiam) (rejecting section 1983 due process claim where city council voted to uphold issuance of a building permit). Where a state has provided reasonable remedies to rectify a legal error by a local administrative body (and CEI raises no challenge in this case to the constitutionality of the state subdivision scheme itself), current authority indicates that due process has been provided, and that section 1983 is not a means for litigating the correctness of the state or local administrative decision in a federal forum. *Cf. Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (state tort remedies adequately vindicate due process where corporal punishment administered in schools); *Parratt v. Taylor*, 451 U.S. 527, 542, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), *quoting with approval Bonner v. Coughlin*, 517 F.2d 1311, 1319 (7th Cir. 1975), *modified en banc*, 545 F.2d 565, *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978) (Stevens, J.) ("[T]he existence of an adequate state remedy to redress property damage inflicted by state officials avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment.").

A different situation may be presented in some instances, particularly in the realm of equal protection, involving gross abuse of power, invidious discrimination, or fundamentally unfair procedures. For example, in *Moran* we cited *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), a case in which the Supreme Court found that a San Francisco building ordinance vesting unreviewable, arbitrary power in city officials was being enforced unconstitutionally so as to eliminate Chinese laundry operators. Different considerations may also be present where recognized fundamental constitutional rights are abridged by official action or state regulation. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). But the ordinary state administrative proceeding involving land use or zoning does not present such a situation, regardless of how disappointed the license or privilege seeker may feel at being initially turned down. Thus, where—as here—the state has erected a complex statutory scheme and provided for avenues of appeal to the state courts, property is not denied without due process simply because a local planning board rejects a proposed development for erroneous reasons or makes demands which arguably exceed its authority under the relevant state statutes.

the United States Constitution was violated when Bolton's Planning Board, for the purpose of protecting what it viewed as the town's basic character, openly interpreted state subdivision laws and a state court decision in ways which frustrated plaintiffs' large-scale housing development of a particular design.

Such a claim is too typical of the run of the mill dispute between a developer and a town planning agency, regardless of CEI's characterizations of it and of defendants' alleged mental states, to rise to the level of a due process violation. The authority cited by CEI, as well as other cases, all suggest that the conventional planning dispute—at least when not tainted with fundamental procedural irregularity, racial animus, or the like—which takes place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution. This would be true even were planning officials to clearly violate, much less "distort" the state scheme under which they operate.[10] A federal court, after all, "should not ... sit as a zoning board of appeals." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 12, 94 S.Ct. 1536, 1542, 39 L.Ed.2d 145 (1974) (Marshall, J., dissenting). *Every* appeal by a disappointed developer from an adverse ruling by a local Massachusetts planning board necessarily involves some claim that the board exceeded, abused or "distorted" its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason. It is not enough simply to give these state law claims constitutional labels such as "due process" or "equal protection" in order to raise a substantial federal question under section 1983. As has been often stated, "[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution." *Crocker v. Hakes*, 616 F.2d 237, 239 n.2 (5th Cir. 1980) (per curiam). *See also Paul v. Davis*, 424 U.S. 693, 700, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976) *quoting Screws v. United States*, 325 U.S. 91, 108–09, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945) ("Violation of local law does not necessarily mean that federal rights have been invaded."); *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944) ("[N]ot every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another."). *Cf. Fair Assessment In Real Estate Association, Inc. v. McNary*, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (no cause of action stated under section 1983 for claims related to discriminatory administration of state tax system). In short, we see nothing in the present case to distinguish it sufficiently from the usual land developer's claim under state law to warrant recognition of a federal constitutional question. CEI may quite possibly have state law claims on the facts alleged. If so, there appear to be adequate state law remedies to vindicate these claims without resort to a federal court.[11] *See Parratt v.*

---

**10.** In *Kadar Corp. v. Milbury*, 549 F.2d 230 (1st Cir. 1977), this court held that, at least as to a single defendant in that case, a federal cause of action might be stated in a conventional planning dispute context. That case involved review of a motion to dismiss for failure to state a claim, however, where courts are traditionally very liberal in allowing plaintiffs to at least make a showing of their evidence. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). We do not construe *Kadar* as precedent for the bald proposition that federal due process is implicated whenever a town official withholds a permit in violation of state law.

**11.** Even were we to recognize that a constitutional claim was stated on these facts, we have serious doubts that CEI would prevail on this claim. As noted previously, the environmental study regulation was never used by the Board as a ground of disapproval. The open space question, meanwhile, was the subject of a state court decision which, even if not immediately appealable, could have been called into question in a subsequent action had CEI submitted another "plan" (of some sort) which was rejected by the Board. While this option may appear to be time-consuming, we note that CEI's federal action has hardly been a speedy process. The present action was filed some six years ago. In addition, the town's new bylaw against irregular lots and the new filing fee were both passed in accordance with proper state law procedures; CEI does not seriously contest their independent validity on either substantive or procedural grounds. Finally,

*Taylor*, 451 U.S. 527, 542, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981). *Cf. Kent Island Joint Venture v. Smith*, 452 F.Supp. 455 (D.Md.1978) (district court abstaining in case where local officials approved allegedly "unreasonable" water and sewer rules in order to frustrate local developer).

In sum, we find to be without merit CEI's generalized claim that it was denied procedural and substantive due process in the pursuit of its subdivision plan[12] and accordingly affirm the district court's judgment as to all of plaintiffs' claims under section 1983.

### Sections 1985(3) and 1986

CEI claims that, in addition to relief under section 1983, it is entitled to recover under section 1985(3)[13] and 1986[14] because the acts of various defendants were motivated by a "class-based, invidiously discriminatory animus. . . ." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The "class" of people allegedly discriminated against, according to CEI, were people who might someday belong to the Appleton Ridge homeowners' association.

We agree with the district court that these claims are without merit. In *Harrison v. Brooks*, 519 F.2d 1358 (1st Cir. 1975), this court explained that

> The requirement that the discrimination [in a section 1985(3) case] be "class-based"

is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious.

*Id.*, at 1360.

In the present case CEI cannot (and does not) assert that it is itself in a class with other persons who are even remotely "similarly situated," much less that CEI has itself been the victim of class-based discrimination. Rather CEI claims to sue *on behalf* of an as yet undefined group of people with unknown income, racial, political and social characteristics. The most that can be said of CEI's relation to the proposed class is that CEI will make a profit if the development and, subsequently, the association come into being. Even assuming that CEI has standing to pursue such a claim on behalf of third parties, *see Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); note 12, *supra*, CEI has failed to define any definite class which would satisfy section 1985(3)'s requirement or to show that the criteria defining the class are invidious. We thus readily affirm the district court's grant of summary judgment on this issue. With no section 1985(3)

even were this case to properly raise some type of a federal due process question, the conventional nature of the dispute and the strength of the state's interest in overseeing land use issues might lead a federal court to abstain from an adjudication of the constitutional claim. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Allstate Insurance Co. v. Sabbagh*, 603 F.2d 228 (1st Cir. 1979); *Kent Island Joint Venture v. Smith*, 452 F.Supp. 455 (D.Md.1978). We note, however, that where allegations of more extraordinary, egregious behavior by public officials are present, one court has found that abstention may not always be appropriate. *Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743 (3d Cir. 1982). *See generally* Note, *Land Use Regulation, the Federal Courts, and the Abstention Doctrine*, 89 Yale L.J. 1134 (1980).

**12.** We need not address the merits of CEI's additional claim that it was denied a first

amendment right to "freely associate" by virtue of the Board's actions. CEI has no standing to litigate such a speculative claim—based as it is on the possible future existence of a politically active homeowners' association—and we accordingly decline to address it. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**13.** Section 1985(3) provides an action for any person or class of persons injured by a conspiracy organized "for the purpose of depriving, either directly or indirectly, [such persons] of the equal protection of the laws . . . ." 42 U.S.C. § 1985(3).

**14.** Section 1986 provides that anyone who knows of a conspiracy which would violate section 1985, has the power to prevent it, and fails to do so, is as liable as a conspirator. 42 U.S.C. § 1986.

claim to support it, CEI's section 1986 claim must similarly fail.

In conclusion, we fully affirm the district court's grant of summary judgment for all the defendants on all of plaintiffs' claims in this case.[15] CEI and Barber have simply failed to demonstrate that they have suffered the deprivation of any right protected by the federal Constitution. In the absence of such proof, summary judgment for defendants was appropriate.

*Affirmed.*

---

**15.** We need not discuss in detail the separate factual patterns surrounding CEI's claims against ERT and Scott McCandless since we have found that none of CEI's substantive rights were violated by actions of any town officials. Suffice it to say that ERT was involved in the entire matter largely to the extent of a $400 contract for an evaluation of CEI's environmental plan and of tentative negotiations for further work with the town. McCandless's chief sins were that he opposed the CEI subdivision plan—a position he was entirely within his rights to take—and that he worked on the ERT review. The actions of neither of these defendants implicated any of CEI's or Barber's rights under the Constitution.