Opinion
MOSK, J.—
In Kavanau v. Santa Monica Rent Control Bd. (1997) 16 Cal.4th 761, 782-786 [66 Cal.Rptr.2d 672, 941 P.2d 851] (Kavanau), we decided that under rent control, adjustment of future rents was generally sufficient to compensate for prior rent ceilings that were set so low as to be confiscatory, and that such adjustments precluded a claim for inverse condemnation. We left open the question, however, whether a future rent adjustment, which we will refer to as a Kavanau adjustment, also forecloses a suit for damages for violation of a right to constitutional due process (U.S. Const., 5th & 14th Amends.) under 42 United States Code section 1983 (hereafter section 1983).[1] We address that question here and conclude that a Kavanau adjustment would preclude section 1983 damages if it is adequate to prevent constitutional injury by compensating for previous excessively low rent ceilings. As in Kavanau, we further conclude that this matter must be remanded to the government agency responsible for setting rent ceilings to *1009 attempt to formulate an adequate Kavanau adjustment, subject to judicial review. In the present case, the trial court did not have the benefit of our Kavanau decision, and the Court of Appeal misapplied that decision in concluding that a Kavanau adjustment was not available as a matter of law. We further explain that the trial court appears to have made some fundamental errors in determining whether and to what extent the rent ceilings imposed in this case were confiscatory.
We further consider whether unreasonable costs, in the form of administrative and attorney fees, imposed on landlords seeking rent increases, may themselves be the basis of a section 1983 claim. We conclude that they may if either of two conditions is present: (1) the costs imposed are part of a government effort to deliberately flout established law, e.g., deliberately obstruct legitimate rent increases; or (2) the landlord suffers confiscation as a result of the imposition of such costs. Because the trial court’s method of determining and calculating damages for this type of injury, affirmed by the Court of Appeal, was incorrect, the matter should be remanded to the trial court for reconsideration.
Background: The Mobilehome Owner/Mobilehome Park Owner Relationship
This case concerns the application of a mobilehome rent control ordinance, and some background on the unique situation of the mobilehome owner in his or her relationship to the mobilehome park owner may be useful. “The term ‘mobile home’ is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. [Citation.] A mobile home owner typically rents a plot of land, called a ‘pad,’ from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.” (Yee v. Escondido (1992) 503 U.S. 519, 523 [112 S.Ct. 1522, 1526, 118 L.Ed.2d 153].)
Thus, unlike the usual tenant, the mobilehome owner generally makes a substantial investment in the home and its appurtenances—typically a greater investment in his or her space than the mobilehome park owner. (See *1010 Baar, The Right to Sell the “Im”mobile Manufactured Home in Its Rent-controlled Space in the “Im”mobile Home Park: Valid Regulation or Unconstitutional Taking? (1992) 24 Urb.Law. 157, 158, fn. 13.) The immobility of the mobilehome, the investment of the mobilehome owner, and restriction on mobilehome spaces, has sometimes led to what has been perceived as an economic imbalance of power in favor of mobilehome park owners (id. at pp. 170-182) that has in turn led many California cities to adopt mobilehome rent control ordinances (see id. at p. 182 [some 70 cities in California had adopted rent control as of 1992]).
I. Statement of Facts
Because facts in their complexity are integral to an understanding of this case, we recite those facts in considerable detail.[2] Clovis’s Mobile Home Rent Review and Stabilization Ordinance (Clovis Mun. Code, ch. 13, § 5-13.01 et seq., enacted in 1978 and repealed in 1993 (Ordinance)), was one such ordinance. Its intended purpose was to protect mobilehome owners from unreasonable rent increases while recognizing the need of mobilehome park owners to receive rent increases sufficient to cover increased costs and to generate a fair return on their investment (ROI). (Ord., § 5-13.01.) The Ordinance provided that on the filing of a petition signed by more than 50 percent of the mobilehome owners within a mobilehome park, the Clovis Rent Review Commission (Commission) would review the rent increase and determine whether it was “so great as to be an unreasonable increase.” (Ord., § 5-13.06(b).) The park owner had the burden to prove by a preponderance of the evidence that the rent increase was reasonable in light of the nonexclusive cost factors enumerated in Ordinance section 5-13.06(i). Those factors included utility rates, property taxes, insurance, advertising, cost-of-living increases attributable to incidental services, repairs and maintenance, capital improvements, amenity and service upgrades, fair rate of ROI, and increased property values. The Ordinance provided that Commission decisions could be appealed to the Clovis City Council within 15 days after the final written decision was mailed to the parties.
The Gallands purchased the Woods Mobile Country Club (the Woods or park), a 260-space park, in 1978. The Gallands hired Planned Management Services (PMS), a Utah corporation in which they owned an interest, and which manages mobilehome parks in a number of states, to manage the Woods. John Chamberlain, the president of PMS, has managed the Woods and acted as the Gallands’ representative in the rent review proceedings since 1978.
*1011 In 1983, the Gallands challenged the constitutionality of the Ordinance and a decision by the Commission permitting only a portion of a noticed rent increase. The Court of Appeal upheld the constitutionality of the Ordinance and the Commission’s rent decision.
In 1985, the Gallands (by PMS and Chamberlain) challenged a Commission decision permitting less than the noticed rent increase. The trial court rejected their challenge, and the Court of Appeal affirmed in an unpublished opinion, in which the court faulted PMS for failing to present any factual evidence in support of its requested rent increase. The court also sanctioned PMS for a frivolous appeal.
A. The Challenged Rent Review Proceedings
1. 1988 Rent Increase
The Gallands noticed a $6 a space rent increase effective April 1, 1988, which raised the monthly rent to $275. The mobilehome owners petitioned the Commission to review the matter. Chamberlain asked what materials and information the Commission would like produced and submitted a letter stating that the rent increase was less- than half the increase in the consumer price index (CPI). Park expenses had increased $46,000 in the preceding year, and cash flow in constant dollars had fallen $10,275 since 1986 and $30,000 since 1984. Ray Wyland, the president of the Woods tenant association, responded that the CPI included increases for items other than housing, Mr. Chamberlain had not specified which expenses had increased, and the Woods rent had increased from $143 in 1979 to $269 in 1987.
In response, the Commission requested that Mr. Chamberlain provide a copy of the CPI and documentation demonstrating their increased expenses and decreased cash flow.
Mr. Chamberlain submitted several applicable CPI’s and prepared tables that provided a breakdown of expenses and set forth the Woods’s receipts, disbursements and pretax cash flows for 1984 through 1987. The tables showed that expenses had increased more than income, resulting in a diminution of cash flows by $30,000 to $35,000, measured in constant 1978 dollars. Mr. Chamberlain also prepared a table showing the Gallands’ ROI for 1984 through 1987.
The Commission heard the matter on April 13, 1988. In addition to hearing from Chamberlain, the Gallands’ certified public accountant, Richard Miranda, testified that regardless of the CPI used, cash flows had *1012 decreased over the last four years. During that period, income had increased 10.8 percent while expenses had increased 18.3 percent. The mobilehome owners’ representative argued the rent should not be increased because the Woods rent was already one of the highest in Fresno County. He submitted the result of a random survey of 12 mobilehome parks in the area that showed the Woods to be charging $75-$100 above every other park surveyed except one, and $50 above that park. He also challenged the Woods’s operating expenses as inflated.
The matter was continued with the consent of the parties to April 29, 1988, to provide the commissioners additional time to digest the materials presented. In the interim, the Commission asked the Gallands to provide substantial additional information by April 26, 1988. That information included further breakdowns and explanations for various expenditures, information on vacancies and cash flow for the prior nine years, and additional information and calculations related to ROI including the value of the park when purchased. Mr. Chamberlain provided much but not all of the information requested. He felt that some of the requested information was irrelevant and that other materials could not be gathered in the short amount of time provided.
At the completion of the continued hearing on April 29, 1988, the Commission voted three to two against the requested increase. In its draft findings, the Commission determined that as “a matter of common knowledge and experience,” certificates of deposit were earning a pretax return of between 7 and 8 percent, whereas the Woods, according to documents provided by PMS, was earning between 11.2 percent and 14.62 percent, depending on which CPI was used. The Commission determined that PMS had presented “no credible evidence, by opinion or otherwise, that this difference in yield is unacceptable, . . . unfair or insufficient to attract capital investment for this type of property.”
The Gallands objected to the decision on various grounds, including that the Commission had relied on information not presented at the hearing. On May 20, the commissioners reiterated their decision that no increase was warranted. They justified the decision, in part, on a portion of Chamberlain’s testimony in the 1985 rent review proceedings regarding fair ROI, which they interpreted to support their conclusion that the current rent provided a fair ROI. The Commission had not notified the parties it would consider evidence from earlier proceedings. The Commission issued its final decision on June 3, 1988, finding three to two that the Gallands had not demonstrated by a preponderance of the evidence that any rent increase was justified.
The Gallands appealed the decision to the city council, which set the matter for hearing on July 18, 1988. The Gallands challenged the Commission’s findings and decision, in particular its determination of a fair ROI, as *1013 well as the fairness of the proceedings. After hearing from both parties, the city council decided the Gallands had not provided sufficient information to enable the council or the Commission to make an intelligent decision regarding a fair ROI for the Woods. The council remanded the matter to the Commission for further proceedings and ordered the Gallands to provide extensive accounting materials and financial documents which the Commission would consider in determining a fair rate of return.
The information requested included audited financial statements for the preceding 10 years showing assets, liabilities, the Gallands’ equity, the ratio of debt to equity and the results of operations; and highs, lows, averages and ranges of the rates of ROI for each of the other mobilehome parks managed by PMS since 1978. The council also instructed the parties that any adjustment for inflation should be based on the United States shelter index.
The Gallands objected to producing some of the information requested because of the time and expense involved. A 10-year audit would cost approximately $75,000 and would take two to three months to complete. Chamberlain and the mobilehome owners’ attorney met with Clovis officials and reached a compromise regarding the additional materials to be presented, no longer requiring audits, but instead permitting PMS to submit data from “the best available existing financial records.”
On October 17, 1988, the Gallands submitted extensive materials in response to the council’s order. The submissions included information in narrative and table format from 16 other mobilehome parks that PMS managed. The data indicated that the average ROI in constant dollars for the parks was 21.7 percent compared to the Woods’s average of 11.9 percent. Regarding vacancy rates over the past 10 years, the Woods averaged a 2.1 percent vacancy rate while other mobilehome parks in Fresno and Clovis averaged a 5.03 percent rate. Regarding fair ROI on the Woods and similar investments, the Gallands submitted a 19-page discussion of various types of investments, their attendant risks and their expected return.
The Gallands also submitted a declaration from Chapman Findlay, Ph.D., former chairman of the department of finance and business economics at the University of Southern California, providing an opinion regarding the fair ROI for the Woods. He compared the expected return for various types of investments and, based on the comparisons, opined that a fair ROI for the Woods measured before tax on equity was 25 percent.
The mobilehome owners submitted a declaration from their expert, Richard Nordstrom, Ph.D., a professor at California State University, Fresno. Dr. *1014 Nordstrom stated that the Woods’s rents and profits since 1978 had increased at a greater rate than the CPI. His calculations, which compared the Gallands’ return after debt service with their actual investment not adjusted for inflation, indicated the Gallands received a 24.9 percent ROI in 1987. He also criticized Dr. Findlay for comparing actual returns to average returns and returns from regulated investments to unregulated ones.
At the Commission hearing on December 16, 1988, the commissioners grappled with defining “investment” for purposes of calculating fair ROI. Dr. Nordstrom testified that return should be calculated on actual dollars invested with no adjustment for inflation. Dr. Findlay stated, albeit in a garbled fashion, that investment dollars must be adjusted for inflation.
The Commission, essentially accepting Dr. Nordstrom’s opinion, concluded the Gallands were receiving a fair ROI and had not justified the rent increase. The commissioners reasoned that Dr. Findlay was of the opinion that a 25 percent ROI was fair. By Dr. Nordstrom’s calculations (using figures not adjusted for inflation), the Gallands received a 24.9 percent ROI in 1987. The Commission also found that both experts had calculated ROI without adjusting the initial investment for inflation, apparently misinterpreting Dr. Findlay’s testimony that the ROI must be measured in “today’s dollars” as meaning there was no need to adjust the initial investment for inflation.
The Gallands appealed the decision to the city council, criticizing the Commission’s lack of inflation adjustment. The council heard the appeal on March 3, 1989. It affirmed the Commission’s decision and adopted its findings. On March 29, 1989, the Gallands requested that Clovis prepare a record of the 1988 rent review proceedings pursuant to Code of Civil Procedure section 1094.6.
2. 1989 Rent Increase
On June 29, 1989, the Gallands noticed a $25 a month rent increase effective September 1, 1989, which raised the per space rent to $294 a month. The mobilehome owners challenged the increase and the matter was set for hearing on September 29, 1989.
The Gallands supported the rent increase with updated figures noting that no rent increase had been permitted for two and a half years. Based on the CPI, the purchasing power of the current $269 rent (worth $119 in 1978 dollars) was less than the $144 rent charged in 1978. The increased rent of $294 would have been worth only $127.89 in 1978 dollars. The increased *1015 rent remained below market levels. In the past six months, four new mobile-home owners had rented spaces at the Woods for $315. The Gallands contended they were not receiving a fair ROI. They renewed their argument that ROI calculations must be adjusted for inflation to prevent confiscatory results. The projected ROI for the Woods in 1989 was 9 percent, the same return realized in 1988.
The mobilehome owners responded that the low ROI appeared to be due to unusually high operating expenses. They opined that the increase reflected the Gallands’ attempt to pass their unsuccessful rent review litigation costs on to the mobilehome owners.
The Commission, in its draft findings, relying on a misinterpretation of a CPI table presented in an unrelated rent proceeding, concluded that 60 percent of the items reflected in the CPI were not relevant to a mobilehome park. Therefore, the rent should be increased by an amount equal to 40 percent of the increase in the CPI. Under this formula, a $14 increase was justified. The Commission also concluded that legal and expert fees incurred in 1988 during the rent adjustment process should not be considered operating costs under the ordinance.
The Commission reviewed the draft findings with the parties at a hearing on November 3, 1989. Clovis’s city attorney acknowledged the Commission should not have relied on the ex parte information without notice to the parties. The hearing was continued to give the parties an opportunity to review and respond to that information.
Despite the fact that the Gallands pointed out the fallacy of the Commission’s method—misinterpreting the statistic that 42 percent of household income on average was spent on housing as signifying that increases in housing prices equaled only 42 percent of the rate of inflation—the Commission readopted its earlier findings with minor modifications. As further explained below, the Commission did not issue a final decision until January 29, 1992. After the final decision issued, the Gallands appealed to the city council in February 1992.
Under the Ordinance, the Gallands could continue to collect the full $25 increase until an appeal before the city council was final. However, beginning February 1, 1990, they opted not to collect the disputed $11 portion of the noticed increase.
The appeal was eventually heard by the city council in May 1992. The council upheld the Commission’s decision, finding it reasonable and supported by a preponderance of the evidence.
*1016 3. 1990 Rent Proceedings
In January 1990, the Gallands noticed a rent increase of $15 a month for mobilehome owners of double-wide mobilehome coaches, and $9 a month increase for mobilehome owners of single-wide coaches, effective April 1, 1990. The mobilehome owners petitioned for review of the increases, and a hearing on the matter was set for May 18, 1990.
The Gallands’ submission included current financial figures showing an 8.1 percent return for the Woods in 1989, approximately the same return generated by certificates of deposit at local institutions. They also reiterated that standard accounting principles required the investment be adjusted for inflation in calculating ROI.
The mobilehome owners contended that the Gallands’ stated expenses were inflated and further claimed that because the Woods’s rent was the second highest in the Fresno/Clovis area, the Gallands were receiving more than a fair ROI. On May 8, 1990, 10 days before the scheduled hearing, the Commission asked the Gallands to provide additional information including an auditor’s statement supporting the Gallands’ reported expenses, further breakdown of a number of the income and expense categories, details regarding the Woods purchase, and copies of the consumer price shelter index for Pacific cities and the United States cities average categories for 1986 through 1989. The Gallands submitted the requested information. They also objected to a request by the mobilehome owners for further detailed financial and accounting information.
The Commission further requested that Chamberlain provide a sworn declaration setting forth details of the park’s operation since 1978, including purchase, ownership, and day-to-day operations; daily, monthly, and annual business and accounting practices; the same information as to PMS; and auditing practices and procedures for the Woods, for other parks managed by PMS, and for the Gallands with regard to this investment. The Commission also requested additional information regarding utilities, water and sewer payments, interest income, management fees, lease payments and legal and accounting expenses. The Gallands complied, providing through Chamberlain a detailed 22-page declaration and 18 pages of additional information.
On August 2, 1990, the city attorney notified the Gallands that a Commission member had contacted the mobilehome owners’ representative and provided him with copies of public records relating to the case. The Commission provided copies of those materials to the Gallands and requested clarification of various matters including the Woods’s purchase, and financing and lease payments, as well as Mr. Galland’s status as a PMS shareholder.
*1017 Chamberlain submitted another declaration and supporting documents which explained the purchase/leaseback agreements. In May 1978, the Margaret G. Rose Testamentary Trust had agreed to provide the Gallands with $600,000 to purchase the Woods in exchange for title to the land and a 50-year leaseback. On June 9, 1978, the Gallands purchased the Woods from a third party for $4,158,625 (land, $500,000; improvements, $3,613,625; personal property, $45,000). The Gallands made a $600,000 down payment and the sellers took two notes. On August 1, 1978, the Gallands executed a grant deed to the trust as required by the terms of the May agreement.
Margaret G. Rose was Mrs. Galland’s mother. She died in 1969 and the trust was created pursuant to her will. Mrs. Galland’s father has a life estate in the trust. Income from the trust estate and, if necessary, principal, are used for his benefit. On his death, any remaining assets will be distributed to Mrs. Galland.
Mr. Galland was a 50 percent shareholder in PMS from 1978 until 1985 but received no compensation or dividends after he resigned as president in 1980. In 1985, Chamberlain purchased Mr. Galland’s shares of stock in PMS.
The Commission, minus the member who had contacted the mobilehome owners, heard the matter on August 13, 1990. The Gallands presented evidence supporting the $15 and $9 rent increases. Their current ROI in the Woods (adjusted for inflation) was 8.1 percent, whereas what they claimed to be equally risky investments enjoyed a 20 to 25 percent rate of return.
Dr. Nordstrom testified for the mobilehome owners. He reversed his earlier position that the investment need not be adjusted for inflation and claimed that had been his position all along. He now believed the requested rent increase was not justified because the Gallands had misstated their investment in past years. He opined that the purchase/leaseback transaction had resulted in a down payment of zero rather than $600,000. Thus, the Gallands’ investment consisted of principal payments on the mortgage only. By his calculations, the Gallands received a 140.63 percent ROI in 1989. Dr. Nordstrom also believed that management fees, lease payments and various extraordinary operating expenses should not be included in operating expenses in calculating cash flow. He further opined that a 14 percent ROI was fair, based in part on a similar average return for cable television franchises which, like mobilehomes, were regulated investments.
At the conclusion of the hearing, the Commission approved increases of $7.50 and $4.50, half of the increases requested. The Commission found the *1018 Woods was jointly owned by the Gallands and the Rose Trust. Therefore, the lease payments were ROI rather than expenses. In addition, the Commission disallowed attorney and expert fees incurred in the rent review proceedings. With these adjustments, the Gallands’ return on the inflation-adjusted investment was 11.8 percent. However, contrary to the opinion of both experts, the Commission concluded, based on “common sense,” that the ROI calculation should be based on historic investment. Using the unadjusted figures, the approved rent increases yielded a 23.5 percent ROI, which the Commission deemed fair.
The Commission’s final decision was not issued until January 29, 1992. Both parties appealed. The city council heard the appeals in May 1992, along with the Gallands’ appeal of the Commission’s decisions on the 1989 rent increase. The city council upheld the decisions of the Commission.
The Gallands requested and Clovis granted the Woods rent increases in subsequent years and those proceedings are not before us. In 1993, Clovis amended its mobilehome rent control ordinance to permit automatic, across-the-board annual rent increases tied to the CPI.
B. Judicial Proceedings
In May 1990, the Gallands sued Clovis for damages for inverse condemnation, denial of substantive and procedural due process under the state and federal Constitutions, and for violations of civil rights under section 1983. They contended that Clovis’s application of the Ordinance constituted a regulatory taking because it decreased the value of the property. They also claimed that Clovis’s actions denied them a fair return on their investment. They filed concomitant petitions for writ of administrative mandate challenging the process employed and the denial or modification of the 1988 and 1989 rent increases. The matters were consolidated for trial. The Gallands filed a first amended complaint in January 1993, adding allegations stemming from the 1990 rent review proceedings.
The Gallands alleged that Clovis denied them procedural due process by failing to provide adequate notice as to what they must prove to establish that a rent increase is not an “unreasonably high rent increase” under the Ordinance. Despite the Gallands’ request for some standards, Clovis issued no written guidelines and the Commission’s decisions were so inconsistent that they provided no de facto notice as to the owner’s burden. In addition, Clovis’s application of the rent review scheme denied the Gallands a fair hearing. The Commission relied on ex parte information without notice to the Gallands, it imposed costly and onerous information demands only to *1019 ignore the information when it was produced, it disallowed the Gallands’ costs of complying with those requests as increased operating expenses to support a rent increase, it ignored uncontroverted expert evidence, and it made arbitrary and inconsistent findings to justify its decisions. Further, Clovis failed to issue final Commission decisions and to prepare the administrative record, thus preventing the Gallands from obtaining judicial review of the administrative proceedings and decisions.
The Gallands alleged that the same acts also denied them substantive due process. Clovis’s actions in implementing rent control were arbitrary and unfair and placed an impermissibly onerous and costly burden on the park owner. As a result, the Gallands were denied a fair return on their property. Clovis’s actions, which were taken in accordance with the custom of the municipality, deprived the Gallands of the right to due process in violation of section 1983.
The Gallands also challenged the Commission decisions pursuant to a writ of mandate action under Code of Civil Procedure section 1094.5 on a number of grounds, alleging essentially the same procedural and substantive due process violations as set forth in their complaint.
Clovis answered the complaint, essentially denying the allegations of wrongdoing. It did not assert any affirmative defenses. The case was set for trial on August 19, 1991.
Trial on the consolidated suit and writ proceeding was postponed repeatedly because of Clovis’s delay in making a final decision regarding the 1989 and 1990 increases and in preparing the administrative record. Clovis contends that part of this delay was due to the fact that PMS and the mobile-home owners were involved in settlement discussions until April 1991 and the parties had requested that the final decision not be issued during that period. In August of 1991, the trial court ordered that final written decisions be prepared in all proceedings by October 1, 1991, and that the administrative record be lodged by November 1, 1991. Due to further delays on Clovis’s part, however, final Commission decisions were not issued until June 1, 1992, and the administrative record was not lodged with the trial court until June 3, 1993.
In August 1994, the court issued a statement of decision. It found that the manner in which the Commission and council applied and administered the Ordinance during the 1988, 1989, and 1990 rent review proceedings violated the Gallands’ procedural and substantive due process rights. However, the violations did not effect a taking under the Fifth Amendment sufficient to support an inverse condemnation claim.
*1020 Based on the due process violations, the court granted the petitions for writ of administrative mandate, vacated the Commission decisions and dismissed the administrative proceedings that had denied the 1988, 1989, and 1990 rent increases. The court further determined that the expense and delay caused by the due process violations rendered the rehearing remedy provided by Code of Civil Procedure section 1094.5 “patently inadequate.” The court concluded the Gallands were entitled to damages under section 1983 for their loss of a fair ROI and for the expenses, costs, and reasonable attorney fees incurred as a result of Clovis’s arbitrary and unreasonable actions.
After hearings on the issue of liability and damages, the court awarded the Gallands damages pursuant to section 1983 as follows: (1) $247,885 for costs incurred as a result of the arbitrary and unreasonable administrative proceedings ($254,860 actually spent minus $6,975, what the Gallands would have spent absent the constitutional violations); (2) $236,806 for lost rents from 1988 through March 31, 1995, based on the methodology stipulated to by the parties for calculating a fair ROI; (3) prejudgment interest on items (1) and (2); (4) attorney fees of $378,955; (5) costs of suit pursuant to Code of Civil Procedure section 1033.5; and (6) postjudgment interest from October 10, 1995.
The Court of Appeal affirmed. It found as to the first item of damage that Clovis’s actions during the rent-setting process were indeed arbitrary and irrational and sufficient to sustain the award of damages for substantive due process violations. The Court of Appeal also concluded, for reasons explained more fully below, that our conclusion in Kavanau, supra, 16 Cal.4th 761, that lost rents can be compensated by adjustment of future rents did not apply to section 1983 actions, and that in any event, a Kavanau adjustment was inadequate in the present case.
II. Discussion
The Gallands bring two distinct due process claims under section 1983, corresponding to two different types of economic injury. The first injury stems from Clovis’s failure to fully grant the requested rent increases, resulting in confiscatorily low rents. The second claimed injury is that they were compelled to pay excessive costs in order to obtain a rent increase. As we shall see, each of these injuries may be designated a violation of substantive due process rights. But the two types of injuries are distinct and require different analyses. For the sake of clarity, we will refer to the first type of injury, for the most part, as confiscation, and the second type of injury as a substantive due process violation. We discuss each of these injuries in turn below.
*1021 A. Confiscation Through Denial of Fair Rate of Return
The trial court awarded the Gallands $236,806 in damages from lost rents under section 1983. Clovis contends that insofar as the rent ceilings imposed on the Gallands was confiscatory, it should have the opportunity to cure this situation by adjusting future rent, as discussed in our decision in Kavanau, supra, 16 Cal.4th at pages 782-786. The Gallands, on the other hand, point out that Kavanau did not involve a section 1983 claim, and the law is well established that, except in the limited area of procedural due process violations, the existence of an alternative state remedy does not preclude the pursuit of a section 1983 remedy. (See, e.g., Zinermon v. Burch (1990) 494 U.S. 113, 125-126 [110 S.Ct. 975, 983, 108 L.Ed.2d 100] (Zinermon).) Alternatively, the Gallands contends that a Kavanau adjustment does not apply in the present case because it is inadequate to compensate for the losses they were forced to incur. We will address each of these arguments in turn.
1. Does a Kavanau Adjustment Apply When Section 1983 Damages Are Sought?
In order to answer the above question, we must first clarify the precise nature of the constitutional injury that the Gallands are purported to have suffered—the denial of a fair return on their rent-controlled property.
As we recognized in Birkenfeld v. City of Berkeley (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001] (Birkenfeld), and later in Kavanau, price control regulation, including rent control, involves a distinct branch of constitutional inquiry under the due process clause. Such regulations are generally found to pass constitutional muster “so long as the law does not deprive investors of a ‘fair return’ and thereby become ‘confiscatory.’ [Citations.] Determining prices that will provide a fair return ‘involves a balancing of the investor and the consumer interests.’ [Citation.] ‘It is the product of expert judgment which carries a presumption of validity.’ [Citation.] A reviewing court focuses on whether the regulatory agency took relevant investor interests into account. [Citations.] It is not theory but the impact of the [price regulation] which counts.’ [Citation.] In sum, when considering whether a price regulation violates due process, a ‘court must determine whether the [regulation] may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection for the heart of relevant public interests, both existing and foreseeable.’ ” (Kavanau, supra, 16 Cal.4th at pp. 771-772.) In other words, rent regulation must not prevent an efficient enterprise from “ ‘ “operating successfully,” ’ ” but rent regulators are permitted to adjust prices “within a *1022 ‘broad zone of reasonableness,’ ” balancing the interests of landlords and tenants. (Id. at pp. 778-779.)
In Kavanau, we further held that a landlord may not obtain inverse condemnation damages against a government agency for temporarily imposing rent ceilings that a court had deemed confiscatory so long as the landlord was able to obtain an adequate adjustment of prospective rents that would compensate for past losses. (Kavanau, supra, 16 Cal.4th at pp. 783-784.) As we explained:
“An adjustment of future rents that takes into consideration past confiscatory rents is the converse of the refund that producers in price-regulated industries may have to pay if, during litigation over price levels, they charge prices that a court later determines to be excessive. [Citation.] Moreover, this remedy, as opposed to an award of damages against the Rent Board, places the cost of compensating [the landlord] roughly on those tenants who benefited from unconstitutionally low rents. [Citations.] . . .
“Finally, the remedy of future rent adjustments avoids putting a reviewing court in the position of declaring the appropriate regulated rent ceiling for a particular apartment in order to measure damages. [Citation.] Setting rent ceilings is essentially a legislative task, and agencies, not courts, choose which administrative formula to apply. [Citation.] The state and federal Constitutions require only a fair process that reasonably takes into consideration the landlord’s interests, and a landlord’s return need only fall within a ‘broad zone of reasonableness.’ [Citation.] Accordingly, courts are in no position to determine the appropriate rent ceiling for an apartment as a means of assessing damages. We strongly resist any rule that would impose on a reviewing court the impossible task of finding somewhere in the penumbra of the Constitution a stipulation that a particular apartment in a particular building should rent for $746 per month rather than $745.” (Kavanau, supra, 16 Cal.4th at pp. 783-784.)
As we made clear in Kavanau and elsewhere, a landlord under rent control who is permitted no or excessively low rent increases has the means, via a writ of mandate, to judicially challenge a rent board’s actions. (See, e.g., Kavanau, supra, 16 Cal.4th at p. 767; Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd. (1999) 70 Cal.App.4th 281, 287 [82 Cal.Rptr.2d 569].) As we also made clear, a landlord is charged with the duty to take advantage of such a remedy before seeking damages against a municipality: “A landlord who unnecessarily permits large losses to accumulate cannot complain if the market prevents him from recouping those losses.” (Kavanau, supra, 16 Cal.4th at p. 785.)
*1023 Of course, the fact that overlapping state remedies are available is generally irrelevant to the question whether a cause of action exists under section 1983. (Zinermon, supra, 494 U.S. at pp. 124-125 [110 S.Ct. at pp. 982-983].) We expressly left undecided the question whether the availability of an adequate Kavanau adjustment precludes a section 1983 claim. (Kavanau, supra, 16 Cal.4th at pp. 768, 783.) The answer to this question depends upon whether a Kavanau adjustment is most appropriately characterized as preventing a substantive due process injury from occurring, or if it is better characterized as compensating for a substantive due process injury that has already occurred. If the former, then there would be no substantive due process injury, and no section 1983 claim. If the latter, then the contrary would be true.
The answer to this question in turn lies in the peculiar nature of the constitutional injury inflicted by a confiscatory rate regulation, as suggested by the above discussion. The term “confiscatory” is often used in the context of price regulation to describe a rate ceiling or ordinance that potentially or eventually will cause confiscation. (See Birkenfeld, supra, 17 Cal.3d at p. 169.) But this is not to say that a delay in the upward adjustment of rents to nonconfiscatory levels works substantive due process injury. Indeed, in the field of public utility regulation, the proper remedy for delay in the upward adjustment of rents, or “regulatory lag,” has been equitable relief to enforce the proper rates, not monetary damages against the regulator. (Priest, Principles of Public Utility Regulation (1969) pp. 204-206; see, e.g., Smith v. Ill. Bell Tel. Co. (1926) 270 U.S. 587, 591-592 [46 S.Ct. 408, 409-410, 70 L.Ed. 747].) Thus, a rent control regime that permits landlords to challenge confiscatory regulations in state court via a writ of mandate, and which permits the timely adjustment of future rents to compensate for any regulatory lags that may have occurred, is one that passes constitutional muster.
We suggested as much in Kavanau when rejecting the landlord’s takings argument in that case. “Just as a reviewing court averages the effects of subsidiary aspects of a price-setting scheme by looking at ‘net effect’ [citation], a reviewing court can also average the effects of a price-setting scheme over time. Thus, a fair return over the course of several years will offset a confiscatory return during a particular year. Recognizing that [the landlord] has a continuing right under the due process clause to future rent adjustments that will enable him to earn a fair return, we believe he has not suffered a taking. Put another way, the ongoing process of setting rent ceilings dispels the due process violation, which in this case is the sole basis for a potential takings clause violation.” (Kavanau, supra, 16 Cal.4th at pp. 785-786; see also Yee v. Mobilehome Park Rental Review Bd. (1998) 62 Cal.App.4th 1409, 1423-1427 [73 Cal.Rptr.2d 227] [because of available Kavanau adjustment, no damages available under section 1983 for lost rents *1024 due to excessively low rent ceilings].) Kavanau therefore implies that a system of rent regulation sufficiently flexible to adjust rates upward to compensate for delay inflicts no constitutional injury.
To be sure, Kavanau involved a takings claim, and this case is concerned with what is labeled substantive due process. But we have recognized that a price regulation that causes confiscation may be designated interchangeably as either a taking of property under the Fifth and Fourteenth Amendments of the United States Constitution or a violation of due process. (Santa Monica Beach, Ltd. v. Superior Court (1999) 19 Cal.4th 952, 967 [81 Cal.Rptr.2d 93, 968 P.2d 993]; Kavanau, supra, 16 Cal.4th at pp. 776-777; see also Duquesne Light Co. v. Barasch (1989) 488 U.S. 299, 307-308 [109 S.Ct. 609, 615-616, 102 L.Ed.2d 646].) It would be incongruous for us to conclude, on the one hand, as we did in Kavanau, that a landlord permitted adequate rent adjustments has not suffered a constitutional injury under the takings clause, but, on the other hand, that he or she has suffered such an injury under the due process clause.[3]
This conclusion is also consistent with the recognition that mobilehome rental property is a long-term capital asset, the value of which is determined *1025 by a stream of income expected over a number of years. (See Radford, Regulatory Takings Law in the 1990’s: The Death of Rent Control? (1992) 21 Sw.U. L.Rev. 1019, 1035; see also Brealy & Stewart, Principles of Corporate Finance (4th ed. 1991) p. 30.) An excessively low rate of return followed by an adequate adjustment of future rents will allow a reasonable average return over the life of the investment and therefore avoid confiscation.
Of course, an excessively low rent sustained over a long duration may well inflict losses that no rent adjustment can cure. But as noted, we emphasized in Kavanau that a landlord generally has the capacity to prevent large losses through resort to available state remedies: “[I]f a landlord acts promptly to challenge a confiscatory regulation, and seeks a stay of that regulation during litigation, his losses, and thus any future rent adjustments, are likely to be relatively small. A landlord who unnecessarily permits large losses to accumulate cannot complain if the market prevents him from recouping those losses.” (Kavanau, supra, 16 Cal.4th at p. 785.) A section 1983 remedy is available for constitutional injury inflicted by those acting under color of state law. When the state makes available a judicial procedure that can feasibly prevent a constitutional injury from occurring, no section 1983 remedy will lie when a plaintiff fails to avail himself or herself of that procedure.
It may be, of course, that even if the landlord acts reasonably to prevent large losses from accumulating, a Kavanau adjustment would be inadequate. In Kavanau, we stated that we did not need to “decide what alternative remedy might be appropriate if a landlord can establish that the remedy of future rent adjustments is for some reason unavailable. . . . [B]efore [a landlord] can allege the unavailability of future rent adjustments, he must petition for those adjustments, the Rent Board must determine, subject to judicial review, their appropriate amount, and he must attempt to impose them.” (Kavanau, supra, 16 Cal.4th at p. 785.) Accordingly, when landlords seek section 1983 damages from allegedly confiscatory rent regulation, we hold that they must show (1) that a confiscatory rent ceiling or other rent regulation was imposed and (2) that relief via a writ of mandate and a Kavanau adjustment is inadequate.
Applying this test to the present case, we first consider whether the rent ceilings imposed from 1988 to 1990 were confiscatory. Although the trial court concluded that they were, that conclusion was based at least in part on the questionable assumption that the Gallands were constitutionally entitled *1026 to an ROI of between 20 and 25 percent. Because there appears to have been considerable confusion in the courts below as to what constitutes a confiscatory rate of return, we offer the following guidance on remand:
Although the term “fair rate of return” borrows from the terminology of economics and finance, it is as used in this context a legal, constitutional term. It refers to a constitutional minimum within a broad zone of reasonableness. As explained above, within this broad zone, the rate regulator is balancing the interests of investors, i.e., landlords, with the interests of consumers, i.e., mobilehome owners, in order to achieve a rent level that will on the one hand maintain the affordability of the mobilehome park and on the other hand allow the landlord to continue to operate successfully. (Kavanau, supra, 16 Cal.4th at pp. 778-779.) For those price-regulated investments that fall above the constitutional minimum, but are nonetheless disappointing to investor expectations, the solution is not constitutional litigation but, as with nonregulated investments, the liquidation of the investments and the transfer of capital to more lucrative enterprises.
Of course, a valid price control scheme must permit an efficiently run company, subject to market constraints, to earn a “ ‘return . . . commensurate with returns on investments in other enterprises having corresponding risks.’ ” (Kavanau, supra, 16 Cal.4th at p. 772.) The Gallands correctly cite our opinion in Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 683 [209 Cal.Rptr. 682, 693 P.2d 261] for the proposition that rent regulators must generally permit profits to be adjusted over time for inflation so that the real value of that profit does not shrink toward the vanishing point. But as we also held in Fisher, it is obviously not the case that a rent-controlled investment must earn the same as a non-rent-controlled one: ‘“[S]ome lessening of appreciation is a necessary consequence of any rent control, since future appreciation is to a significant extent a function of increased rental income. [Citation.] It is one of the very sources of long-term appreciation—inflated rents—that rent control measures are intended to restrict.’ [Citation.] [¶] . . . Any price-setting regulation, like most other police power regulations of property rights, has the inevitable effect of reducing the value of regulated properties. But it has long been held that such reduction in property value does not by itself render a regulation unconstitutional. Police power legislation results in a confiscatory ‘taking’ only when the owner has been deprived of substantially all reasonable use of the property. [Citation.] Even a significant diminution in value is insufficient to establish a confiscatory taking.” (Fisher v. City of Berkeley, supra, 37 Cal.3d at pp. 685-686, fn. omitted.) Thus, comparison of the rate of return of rent-controlled mobilehome parks with those of non-rent-controlled parks, as the Gallands made and the trial court accepted in the present case, is of limited *1027 utility in establishing the constitutional minimum rate of return. Moreover, there is nothing in the record to indicate that the average rate of return of the 16 PMS parks surveyed, which were not randomly chosen, was the same as or similar to the average return on mobilehome parks nationally, or, more to the point, the average return on mobilehome parks in the Clovis area.
Furthermore, PMS’s own data indicates that market forces, rather than rent control, were primarily responsible for the Woods’s relatively poor performance in relationship to other PMS mobilehome parks surveyed. This data shows, for example, that in 1987, the year before the present controversy commenced, the ROI for the Woods was 11.8 percent, whereas the average for ROI for the 16 other parks was 22.6 percent. But the data also reveals that in 1987, the base monthly rent charged at the Woods, $269, was equal to the market rate rents. Thus, although the Woods had only a 9 percent ROI in 1988 and 1989, according to its own data, the same data also indicate that this rate of return for rent-controlled property was only slightly below the return the market afforded, and that the wide gap between the Woods and other PMS parks was largely due to factors other than Clovis’s rent control. (See Yee v. Mobilehome Park Rental Review Bd., supra, 62 Cal.App.4th at pp. 1414-1415 [10 percent return on equity in 1994 considered fair by both parties].)[4]
Moreover, as explained above, one measure of whether a regulated enterprise is allowed to operate successfully is whether it continues to attract necessary capital. (Kavanau, supra, 16 Cal.4th at p. 772.) We note that in 1993, during the period that the Gallands were subject to supposedly confiscatory rent ceilings, they were able to obtain a $3 million refinancing loan on the Woods on standard terms for commercial property.
Thus, on remand, the trial court must consider not whether the return on the Woods measured up to some benchmark established by nonregulated investments, but rather whether the 1988 to 1990 rent ceilings were within the constitutionally permitted broad zone of reasonableness.
On the other hand, the Gallands are correct that the substantial legal and administrative costs attributable to the rent review process, discussed at greater length in the next part of this opinion, should be properly included as *1028 expenses when calculating the proper rent readjustment. Under the fair ROI method used in practice by Clovis, it may not arbitrarily exclude the reasonable expenses of seeking legitimate rent increases.
Clovis argues that Oceanside Mobilehome Park Owners’ Assn. v. City of Oceanside (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239] stands for the proposition that a city may not be constitutionally required to include the landlords’ costs of obtaining rent increases as operating expenses when calculating the proper rent levels. Clovis is correct, but only up to a point. In City of Oceanside, the court considered a facial challenge to an ordinance, including a challenge to a provision excluding attorney fees from operating expenses. The court correctly rejected this facial challenge. As explained above, it is the overall result of the rent-setting process, not the method employed or any particular exemption legislated, that determines whether a rent control regime is confiscatory. (Kavanau, supra, 16 Cal.4th at pp. 771-772.) Thus, the exclusion of costs associated with obtaining rent increases is not per se confiscatory. On the other hand, if a rent control ordinance as applied operates to impose large and unnecessary costs on landlords, and if as a result of that imposition a landlord is only able to gamer a rate of return that is deemed confiscatory, we may not ignore the confiscation simply because these costs have been classified as exempt expenses. Accordingly, these expenses must also be considered on remand when determining whether and to what extent Clovis’s rent regulation has been confiscatory and whether remand for a determination of Kavanau adjustment is appropriate.
2. Was a Kavanau Adjustment Inadequate as a Matter of Law?
If the trial court reaffirms that the rent ceilings were confiscatory to some extent, then the matter would generally be remanded to the Clovis City Council to attempt a Kavanau adjustment. The Court of Appeal held that a Kavanau adjustment would be inadequate as a matter of law. Its conclusion was based primarily on the substantial sum of damages accruing from lost rents—$236,806—in part because of Clovis’s long delay in reaching a final decision and preparing the administrative record, which postponed the Gal-lands’ mandamus remedy.
As discussed, we generally presume that a landlord has the means to obtain judicial intervention to prevent large financial losses. But in the present case, although the parties argue over the length of Clovis’s unjustifiable delay in preparing the administrative record, even Clovis concedes that there was some period of unnecessary delay that may have retarded the Gallands’ ability, through judicial intervention, to prevent their losses from *1029 accumulating. Although the trial court did not address this question precisely, it found, in the context of rejecting Clovis’s statute of limitations defense, a “delay in providing the administrative record for 1988, 1989 and 1990, and the co-extensive delay in issuing final decisions for the 1989 and 1990 administrative proceedings . . . On the other hand, the Ordinance allowed the Woods rent increases to go into effect and did' not require the Gallands to rescind them until the city council’s decision was final in 1992. The Gallands voluntarily rescinded at least a portion of their rent increases after the Commission’s decision. The trial court must determine on remand whether, under the circumstances, the Gallands reasonably used the available legal machinery to prevent a constitutional injury from occurring.
Even if it is concluded that the Gallands suffered undue delay, the question whether a Kavanau adjustment is adequate is in large part a factual one, and not for the speculation of an appellate court. Here, we note that although the amount of the alleged lost rent is fairly substantial, the Woods has 260 units, and it is therefore within the realm of possibility that lost rents could be recouped over a relatively short period of time with realistic rent increases. In any case, both Clovis’s decisions and those of the trial court predated our decision in Kavanau. Assuming that the Gallands are able to demonstrate the rent ceilings were confiscatory, as discussed above, it is for Clovis to attempt on remand to adjust rent ceilings to compensate for lost rents, and for the trial court to review whether such adjustments are adequate to meet the constitutional standard for a fair return. This remand “avoids putting a reviewing court in the position of declaring the appropriate regulated rent ceiling for a particular apartment in order to measure damages” (Kavanau, supra, 16 Cal.4th at p. 784), and places the rate-setting function first and foremost in the hands of the government agency (ibid.). If, however, a Kavanau adjustment proves to be inadequate in this case to reestablish an average reasonable rate of return, then the Gallands would be free to pursue their section 1983 action on the grounds that state equitable remedies have failed to prevent the constitutional injury from occurring.[5]
It is conceivable there might be a case when it is clear that resort to a Kavanau adjustment will not prevent a constitutional injury from occurring. *1030 For example, there may be an instance when, despite a landlord’s reasonable efforts, confiscatory rent regulations sustained over a long period of time have caused the enterprise to fail. Under such circumstances, a section 1983 damages remedy may well be available. But nothing of that sort is evident in the record of the present case.
B. Excessive Procedural Costs
The Gallands claim, and the trial court found, that they were damaged in the amount of $247,885 for costs incurred as a result of arbitrary and unreasonable administrative proceedings. Although difficult to pigeonhole, this claim is properly understood more as a substantive, rather than as a procedural, due process claim. A procedural due process claim possesses two components: first, that an individual has been deprived of a constitutionally protected liberty or property interest; and second, that this deprivation, while not necessarily unconstitutional in and of itself, was rendered unconstitutional because it was undertaken without according the individual the appropriate hearing. (See, e.g., Zinermon, supra, 494 U.S. at pp. 133-134 [110 S.Ct. at pp. 987-988].) In the present case, however, the Gallands contend that the rent control process was itself an independent source of injury, by imposing on them exorbitant costs for what the trial court termed Clovis’s “overly broad, unduly burdensome, arbitrary, unreasonable, and inconsistent requests for information” in order to obtain legitimate rent increases. In other words, the source of their injury was not the lack of procedural protections that led to the denial of a fair rent increase, but the fact that Clovis made demands on them as a condition of obtaining a rent increase that, in addition to being costly, were intrinsically arbitrary and irrational. This is best understood as a claimed violation of substantive due process.
The question, then, is whether Clovis’s actions during the rent adjustment hearings of 1988 to 1990, independent of the outcome of those hearings (which was addressed in the previous part of this opinion), violated the Gallands’ substantive due process rights. In order to answer this question, we must first understand in greater depth the nature of those rights. To do so, we begin with the recent clarification of the meaning of substantive due process in County of Sacramento v. Lewis (1998) 523 U.S. 833 [118 S.Ct. 1708, 140 L.Ed.2d 1043] (County of Sacramento).
*1031 In County of Sacramento, the parents of a motorcycle passenger killed in a high-speed chase sued the county and the responsible officer for violations of substantive due process rights under section 1983. In rejecting their claim, the United States Supreme Court explained: “Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action ....[¶]... While due process protection in the substantive sense limits what the government may do in both its legislative [citation] and its executive capacities [citation], criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue. [¶] Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be ‘arbitrary in the constitutional sense,’ [citation], thereby recognizing the point made in different circumstances by Chief Justice Marshall, ‘ “that it is a constitution we are expounding,” ’ [citations]. Thus, ... we [have] said that the Due Process Clause was intended to prevent government officials ‘ “ ‘from abusing [their] power or employing it as an instrument of oppression.’ ” ’ [Citations.] [¶] To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience. . . . [¶] It should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law’s spectrum of culpability. Thus, we have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. . . . [W]e [have] explained that the Fourteenth Amendment is not a ‘font of tort law to be superimposed upon whatever systems may already be administered by the States,’ and [citation] that ‘[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.’ We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. [Citations.] It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.” (County of Sacramento, supra, 523 U.S. at pp. 845-849 [118 S.Ct. at pp. 1716-1718], fn. omitted, some italics added.)
*1032 The Gallands argue that County of Sacramento is inapposite inasmuch as it pertains to executive action, whereas Clovis’s actions are what it characterizes as “quasi-judicial.” Of course, most executive or administrative agencies perform quasi-judicial functions. These functions, when carried out by such agencies, are more appropriately designated as executive rather than legislative functions—they are implementing legislation, not legislating. The Gallands’ argument is valid, however, insofar as it recognizes that the determination of when a substantive due process violation occurs is contextual. As the County of Sacramento court itself suggested, a less egregious government action than was committed in that case may “shock the conscience” if the executive or administrative actor had an opportunity to deliberate. Thus, for example, the court recognized that the most appropriate substantive due process standard for injury inflicted on a person in custody may be “deliberate indifference,” as it is under the Eighth Amendment, although the court rejected the “deliberate indifference” standard in the context of high-speed chases. (County of Sacramento, supra, 523 U.S. at p. 851 [118 S.Ct. at p. 1719].)
Nonetheless, other cases both before and after County of Sacramento have affirmed in a variety of contexts, using a variety of verbal formulations, the principle that the arbitrary government conduct that triggers a substantive due process violation is not ordinary government error but conduct that is in some sense outrageous or egregious—a true abuse of power. (See, e.g., Fagan v. City of Vineland (3d Cir. 1994) 22 F.3d 1296, 1306 [“shock the conscience” standard used for police pursuit, “deliberate indifference” standard for those in custody]; Natale v. Town of Ridgefield (2d Cir. 1999) 170 F.3d 258, 263 [rejecting substantive due process claim regarding issuance of building and zoning permits and affirming that “[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority”]; Creative Environments, Inc. v. Estabrook (1st Cir. 1982) 680 F.2d 822, 832-833 [ordinary state law error in land use planning process not a substantive due process violation]; Uhlrig v. Harder (10th Cir. 1995) 64 F.3d 567, 574 [in the context of arguable government negligence leading to murder of therapist by criminally insane mental patient, court affirmed that substantive due process violation must be intentional or reckless and that the “degree of outrageousness and a magnitude of potential or actual harm [must be] truly conscience shocking”]; Rivkin v. Dover Tp. Rent Leveling Bd. (1996) 143 N.J. 352 [671 A.2d 567, 574-575] (Rivkin) [rejecting claim that errors in mobilehome rent review process amounted to substantive due process violation, and affirming that “substantive due process is reserved for the most egregious governmental abuses against liberty or property rights”]; Clark v. City of Hermosa Beach (1996) 48 Cal.App.4th 1152, 1186 [56 Cal.Rptr.2d 223] [zoning decision *1033 that violated state law in some respects but was not wholly irrational and did not shock the conscience was not a substantive due process violation].)
The New Jersey Supreme Court in Rivkin, supra, 671 A.2d 567, a case like our own in some respects, concisely explained why the mere finding that a government decision is arbitrary or capricious is not sufficient to establish a substantive due process violation. In that case, a mobilehome park owner brought an action against a municipality for denying a requested rent increase in a proceeding that was tainted with the open bias and conflict of interest of one of its members. In rejecting the owner’s section 1983 substantive due process claim, the court stated: “It is a mistake ... to equate the concept of ‘arbitrary and irrational’ governmental land use decisions with the substantive component of the Due Process Clause of the Fourteenth Amendment. In the land use context, the phrases ‘arbitrary and irrational’ or ‘capricious’ are often shorthand expressions for a standard of review that asks whether there are sufficient facts in the record to support the agency’s action or whether the agency has followed its legislative mandate. [Citation.] [¶] . . . ‘[F]requently in our law a court on an appeal from action of a public agency will determine if the agency acted arbitrarily or capriciously. Accordingly while the words ‘arbitrary and capricious’ may sound harsh, they are simply the standard of appellate review in particular cases. [Citation.] ... It is for this "reason that . . . substantive due process protections should be reserved for ‘truly irrational’ governmental abuses that bear no relationship to the merits of the pending matter.” (Rivkin, supra, 671 A.2d at pp. 576-577.)
Moreover, the notion that a cognizable section 1983 action is found only in circumstances of outrageous government abuse applies even when it leaves a person seriously injured by government action or inaction without a remedy, as when the government is protected from liability by state law statutory immunities. Thus, in Davidson v. Cannon (1986) 474 U.S. 344, 346-348 [106 S.Ct. 668, 669-671, 88 L.Ed.2d 677], for example, a prisoner who was beaten by a fellow inmate after prison officials negligently failed to intervene, was denied any section 1983 relief, and was also unable to pursue a tort action due to state law immunity.
Against this background, we must formulate more precisely the appropriate substantive due process standard for determining when an administrative body charged with implementing a law acts erroneously in such a way as to injure an individual’s economic and property interests. The shocks the conscience standard, although generally applicable, is not particularly helpful. As the County of Sacramento court recognized, that standard is “no calibrated yard stick,” but merely “poin[ts] the way.” (County of Sacramento, supra, 523 U.S. at p. 847 [118 S.Ct. at p. 1717].) The standard seems *1034 especially apt with regard to assaults on bodily integrity by government officials—when, as Justice Frankfurter stated, government action moves “too close to the rack and screw to permit of constitutional differentiation.” (Rochin v. California (1952) 342 U.S. 165, 172 [72 S.Ct. 205, 210, 96 L.Ed. 183, 25 A.L.R.2d 1396].) Is there a standard that can identify more precisely when the actions of an administrative body charged with implementing the law are arbitrary and conscience-shocking in a constitutional sense?
We conclude that the court in Silverman v. Barry (D.C. Cir. 1988) 845 F.2d 1072 [269 App.D.C. 327] has given the most satisfactory answer to this question. In that case, a series of arguably unjustifiable administrative delays led to the frustration of the plaintiff’s plans to convert his building from a rental into condominium before a conversion moratorium was imposed. The court stated: “To succeed in a § 1983 suit for damages for a substantive due process . . . violation, a plaintiff must at least show that state officials are guilty of grave unfairness in the discharge of their legal responsibilities. Only a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983. [Citation.] Inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress under this statute.” (Id. at p. 1080, italics added.) We conclude that the above standard is consistent with the Supreme Court’s most recent pronouncements regarding substantive due process violations for executive action. Because substantive due process does not encompass “negligently inflicted harm” (County of Sacramento, supra, 523 U.S. at p. 848 [118 S.Ct. at pp. 1717-1718]), but rather “only the most egregious official conduct,” wherein government officials are " ' " ‘[abusing their] power, or employing it as an instrument of oppression' " ' " (id. at p. 846 [118 S.Ct. at p. 1716]), it cannot be said to encompass governmental mistakes and bureaucratic errors that are something less than an abuse of power.
Roy v. City of Augusta, Maine (1st Cir. 1983) 712 F.2d 1517, cited by the Barry court, illustrates this deliberate flouting of the law standard. In Roy, the Supreme Judicial Court of Maine decided that the city had wrongfully denied plaintiff the renewal of a license to operate a pool and billiard room that had met with some community opposition. In response to the resultant court order, the city clerk issued the license that the plaintiff had originally sought but that had expired in the interim. As a result, the plaintiff had to suspend his business activities, lost his property, and filed a section 1983 action against the city. The court reaffirmed the rule it had stated in Creative Environments, Inc. v. Estabrook, supra, 680 F.2d 822, that ordinary state law error does not amount to a substantive due process violation. Nonetheless, the court reversed the district court’s dismissal of the complaint, concluding *1035 that the plaintiff would have a valid claim of a substantive due process violation if it could “prove that his injury was due not merely to the law’s delay and [the government’s] errors but to defendants’ deliberate disregard of the state’s fundamental process.” (Roy v. City of Augusta, Maine, supra, 712 F.2d at p. 1524.)[6]
This standard is consistent with the holding of a series of cases, some of which are cited by the Gallands, that find substantive due process violations when municipalities refuse to issue nondiscretionary building permits. (See Mission Springs, Inc. v. City of Spokane (1998) 134 Wash.2d 947 [954 P.2d 250] (Mission Springs); Bateson v. Geisse (9th Cir. 1988) 857 F.2d 1300, 1303-1305; Bello v. Walker (3d Cir. 1988) 840 F.2d 1124, 1129; Scott v. Greenville County (4th Cir. 1983) 716 F.2d 1409, 1419.) For example, in Mission Springs, supra, 954 P.2d 250, a developer that had run the entire gauntlet of zoning and planning requirements was denied building permits by the city council, even though it was clear from applicable statutes and ordinances, and from the advice of the city attorney, that the city council had no discretion at that point to deny the permits. (Mission Springs, supra, 954 P.2d at pp. 252-259.) Such refusal to issue clearly nondiscretionary permits is properly characterized as a deliberate flouting of the law.[7] (See also Cohan v. City of Thousand Oaks (1994) 30 Cal.App.4th 547, 561 [35 *1036 Cal.Rptr.2d 782] [denial of development permits after numerous violations of the city’s own procedures as well as state law amounts to a “cavalier . . . disregard[]” of developers’ substantive and procedural due process rights].)[8]
In cases such as the present, a deliberate flouting of the law may be said to have occurred if the city’s demands for information and other procedural demands were so excessive and irrelevant to the regulatory task at hand as to lead a court to conclude that such demands were imposed not in order to obtain more information or increase the reliability of the eventual decision, but rather to obstruct or discourage landlords from either requesting or obtaining reasonable rent increases to which they are constitutionally entitled. We emphasize, however, that something more than mere “bureaucratic bungling” is required. Rent control boards, like other regulators, have need of information from those regulated, and the act of requesting information is itself a legitimate government activity. Even if, for example, the information requested is in retrospect excessive in relationship to the relevant inquiry, that does not of itself constitute a due process violation compensable under section 1983.
Consistent with the deliberate flouting of law standard announced today, we hold as a prospective rule that, if faced with a situation similar to this case, a landlord who believes that a rent board’s information request is arbitrary and overly burdensome must register an objection to the request and give some explanation for the objection. This then puts the board on notice that the request is considered overreaching, and gives the board the opportunity to respond. If the board nonetheless insists on the information, *1037 then the landlord has the option of either submitting the information under protest or refusing to fully comply with the information request. If the board then denies the application, either on the merits or based on the fact that not enough information had been provided, the landlord may then seek a writ of mandate overturning the decision. If the board based its decision on a failure to provide sufficient information, then the court would determine whether the information submitted was in fact sufficient. In making that determination, a court would look to analogous areas of law such as the law of administrative subpoenas. (See Connecticut Indemnity Co. v. Superior Court (2000) 23 Cal.4th 807, 817 [98 Cal.Rptr.2d 221, 3 P.3d 868]; 2 LaFave, Search and Seizure (3d ed. 1996) § 4.13(d), pp. 740-741 [in determining whether a subpoena’s request for information is excessive, courts perform a balancing test, considering factors including: (1) the scope of the investigation; (2) the probability that the records will reveal evidence helpful to the investigation; (3) the financial or economic burden that compliance imposes on the subpoenaed party].)
With the appropriate standard in mind, we review the trial court’s determination that the Gallands suffered $247,885 in damages from substantive due process violations because of the “arbitrary, unduly burdensome, and unreasonable actions” of Clovis in requiring expensive and unnecessary audits and other data during rent adjustment proceedings. We observe at the outset that these proceedings were, at the very least, inefficient. Neither the Ordinance nor any implementing regulations made clear precisely how the Gallands were to obtain a rent increase. This regulatory vacuum was filled by an ad hoc proceeding marked by Clovis’s shifting, costly, and at times ill-considered requests for information. As a result, the Gallands lacked a timely and affordable means by which to seek rent increases.
But was the trial court correct in determining whether and in what amount damages were owed under section 1983? The amount of damages was based, as explained above, on a one-page document prepared by John Chamberlain, entitled Costs of Fair Proceedings, and on his testimony, that a fair rent adjustment proceeding should have cost no more than $2,325 per year. Multiplying that by the three years in question, the total comes to $6,975. That figure, subtracted from the $254,860 that the Gallands actually spent for the three years of rent proceedings, yielded the $247,885 damages figure.
In light of the above discussion, the fallacy of the trial court’s method of determining the existence and extent of the supposed substantive due process damages appears evident. Even assuming that the estimated cost of a “fair proceeding” were supported by substantial evidence, the fact remains that not every government action that fails to measure up to the ideal of a fair and *1038 efficient rent control proceeding inflicts a constitutional injury. Only those government actions that amount to a deliberate flouting of the law qualify for relief under section 1983 (Silverman v. Barry, supra, 845 F.2d at p. 1078), not “inadvertent errors, honest mistakes, agency confusion, [or] negligence” (ibid.).[9]
We observe that the determination of allowable increases under a rent control regime is a complicated calculation that often requires the production and analysis of extensive financial data. (See, e.g., Carson Mobilehome Park Owners’ Assn. v. City of Carson (1983) 35 Cal.3d 184, 193 [197 Cal.Rptr. 284, 672 P.2d 1297] [mobilehome rent control ordinance includes review of “complex financial and tax data”]; see also Baar, Guidelines for Drafting Rent Control Laws: Lessons of a Decade (1983) 35 Rutgers L.Rev. 723, 815 [the requirements that expense and income information for several years accompany individual rent adjustment petitions is inherent in some methods of determining fair return].) Nor is information comparing rental income and other data between mobilehome parks irrelevant to the task of adjusting rent levels. Indeed, the Gallands’ own expert at trial used such data to argue that the permitted rental increases had been insufficient. Clovis’s inquiries into the financial arrangements between the Gallands, Chamberlain, PMS, and the Rose Trust were also legitimate, allowing Clovis to understand whether certain transactions should be classified as income rather than expenses or investment. Moreover, the fact that some of the requested information proved not to be determinative of the rent regulators’ ultimate decision does not establish constitutional injury.
Nor, unlike the building permit cases cited above, is it clear from the record that Clovis abused its authority by refusing to fulfill a clearly established, nondiscretionary duty toward the Gallands. On the contrary, the rate-setting process involves the exercise of considerable discretion and is, as we have recognized, “ ‘often hopelessly complex.’ ” (Kavanau, supra, 16 Cal.4th at p. 778.)
Moreover, the Gallands themselves were not blameless. As discussed, their attempt at a rent increase in 1985 was rebuffed for failure to specify the cost increases that would justify such an increase, and they were sanctioned *1039 for frivolously appealing the trial court’s decision. In spite of that fact, and in spite of the fact that the Clovis mobilehome rent control ordinance clearly provides that rent increases were to be justified by evidence of cost increases for such items as “utility rates, property taxes, insurance, advertising, governmental assessments, cost of living increases attributable to incidental services, normal repairs and maintenance, capital improvements,” etc. (Ord., § 5-13.06(i)), the Gallands were initially not forthcoming in providing such specific financial data.
All that being said, we conclude that we need not and should not decide whether any of the many information requests and other administrative requirements that the Gallands contend were arbitrary and burdensome violated their substantive due process rights. Rather, all we decide is that the trial court did not employ the proper standard of gauging constitutional injury. On remand, the court must consider in context, against the overall background of Clovis’s dealings with the Gallands, each of the administrative expenses that the Gallands contend inflicted such injury to determine whether any such expenses were imposed in deliberate violation of the law.
In defense of the trial court’s decision, the Gallands cite Birkenfeld, supra, 17 Cal.3d at page 169. There, we held that one of the necessary components of a constitutional rent control ordinance is that it provide a mechanism to adjust rents to reflect changed conditions “without a substantially greater incidence and degree of delay than is practically necessary.” (Ibid.) We invalidated in part an ordinance that failed to contain such a mechanism—it provided no means of across-the-board rental adjustments in a city with more than 20,000 units under rent control, required an apartment-by-apartment consideration with no means by which a landlord could consolidate rent adjustment requests, and precluded the rent board from delegating adjustment hearings to staff. (Id. at pp. 169-172.) With such an inadequate mechanism, “many or most rent ceilings would be or become confiscatory.” (Id. at p. 169.) The Gallands argue in effect that a rent-setting process that falls below the standard suggested in Birkenfeld is unconstitutional, and any costs incurred in complying with this substandard process should be recoverable in a section 1983 action.
Birkenfeld, however, is inapposite. There is no claim that Clovis’s rent control ordinance is unconstitutional on its face. The issue is not whether Clovis’s failure to adjust rents in a timely fashion has led to a confiscatory result—a question we addressed in the previous part of this opinion. Rather, we are concerned in this part with whether the trial court was correct in awarding the Gallands $247,885 in damages resulting from administrative and legal expenditures during the rent-setting process itself. In determining whether a constitutional injury has taken place, we follow the path of the *1040 United States Supreme Court and other courts in asking whether government agents have deliberately committed obstructive and unlawful acts designed to interfere with the Gallands’ property rights.[10]
Finally, we note that even if Clovis’s actions do not rise to a deliberate flouting of the law, the Gallands are not necessarily without a remedy. As explained above, Clovis cannot in this case arbitrarily exclude the administrative expenses it has imposed on the Gallands in calculating whether they are receiving a fair ROI. Thus, in determining whether a Kavanau adjustment is appropriate under the rent control regime in Clovis, the city must consider all such expenses. But administrative expenses can be charged directly to Clovis in the form of section 1983 damages only when the city imposes them in deliberate contravention of the law to obstruct the Gallands’ constitutionally based property rights.
III. Procedural Due Process
The Gallands also claim that the rent adjustment process was marred by various procedural defects, such as reliance on ex parte materials. Of course, not all breaches of procedural due process by an administrative agency are prejudicial. (In re La Croix (1974) 12 Cal.3d 146, 154 [115 Cal.Rptr. 344, 524 P.2d 816].) On the other hand, when the process itself is fundamentally unfair, even agency determinations supported by substantial evidence may be overturned; it is the very unfairness of the hearing that undermines the reliability of the administrative record being reviewed. (See Gates v. Department of Motor Vehicles (1979) 94 Cal.App.3d 921, 926 [156 Cal.Rptr. 791].) In this case, however, if the procedural due process violations resulted in any injury, it was the identical injury discussed in the first part of our discussion, i.e., lost rents due to partial or complete denials of the 1988, 1989, and 1990 rent increase requests. Remand to the trial court and/or Clovis as outlined above will address this injury.[11]
*1041 IV. Disposition
The judgment of the Court of Appeal is reversed with directions to remand the cause to the trial court for proceedings consistent with this opinion, including remand to the City of Clovis if appropriate.
George, C. J., Kennard, J., Werdegar, J., and Chin, J., concurred.

Section 1983 provides, “Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .”

Much of the material in this part of the opinion is taken from the Court of Appeal’s statement of facts.

The dissent asserts, contrary to authority, that substantive due process provides a more exacting standard for determining whether a regulation is confiscatory than does the takings clause at issue in Kavanau. Kavanau.’s holding was not based on such a distinction, but on the well-established principle that the Constitution permits government regulators great flexibility in making price control decisions and that, accordingly, delays in lawful price adjustment are not per se constitutional violations.
For a similar reason, the dissent is off the mark when it analogizes this case to cases of racial discrimination and claims that no Kavanau-like remedy would be permitted for such discrimination. Of course, discrimination based on a suspect class such as race will receive the strictest judicial scrutiny and not be permitted absent the most compelling interest. (Hunter v. Erickson (1969) 393 U.S. 385, 391-392 [89 S.Ct. 557, 560-561, 21 L.Ed.2d 616].) Governmental acts of deliberate racial discrimination are almost invariably constitutional violations cognizable under section 1983. (See Washington v. Davis (1976) 426 U.S. 229, 239-241 [96 S.Ct. 2040, 2047-2048, 48 L.Ed.2d 597].) On the other hand, given the discretion permitted the government in regulating prices, delays in price adjustments cannot be considered the constitutional equivalent of intentional racial discrimination.
The dissent, as well as the concurring and dissenting opinion, are also incorrect that Kavanau’s holding should be interpreted as a requirement for landlords to exhaust administrative remedies before seeking constitutional damages, contrary to established law. (See Patsy v. Florida Board of Regents (1982) 457 U.S. 496 [102 S.Ct. 2557, 73 L.Ed.2d 172]; Felder v. Casey (1987) 487 U.S. 131 [108 S.Ct. 2302, 101 L.Ed.2d 123].) Rather, as explained above, a prospective rent remedy prevents a taking, and implicitly a substantive due process violation, from occurring. In fact, neither the dissent nor the concurring and dissenting opinion cites authority for the proposition that a regulatory delay in a lawful price adjustment gives rise to an actionable substantive due process violation under section 1983. Perhaps cognizant of this lack of authority, the dissent “wonder[s] if we took the wrong turn long ago when we began treating rent control like any other price-regulated industry.” (Dis. opn., post, at pp. 1051-1052.) It offers no persuasive reason, however, for reevaluating precedent on this point. (See Pennell v. San Jose (1988) 485 U.S. 1, 11-12 [108 S.Ct. 849, 857-858, 99 L.Ed.2d 1].)

At oral argument, the Gallands’ counsel argued that a Kavanau adjustment would be ineffective because the record showed that there had never been more than a $20 difference between the regulated rent and the market rent, and therefore there would be a severe practical limit on the upward adjustment of rents called for under Kavanau. Yet the fact that there was such a small margin between regulated rent and market rent calls into question whether confiscation did indeed take place and, in any case, suggests that the confiscation, if any, was correspondingly limited.

The Court of Appeal briefly mentioned two other reasons for not resorting to a Kavanau adjustment. The first is that many of,the Woods mobilehome owners are elderly and therefore a “Kavanau remedy [is] less likely to place the cost of compensating the Gallands on those [mobilehome owners] who benefited from the confiscatory rents . . . .” This reason is speculative and ill founded. Although future rent adjustments may not fall with mathematical exactitude on those who have benefited from an excessively low rent ceiling, such adjustments nonetheless place the burden of compensating the landlord on the group that has, as a whole, most benefited, as well as on new tenants freely transacting to pay higher rents. (See Kavanau, supra, 16 Cal.4th at p. 784.)
The Court of Appeal also stated that “the long and tortured path this case has taken to date militates against sending the matter back for further administrative proceedings addressing these ancient clams.” But remand to the city is what Kavanau prescribes. It might be a *1030 different matter if there were evidence that a government agency had proven to be unwilling or unable to conduct the proper proceedings on remand. Here, on the contrary, Clovis has endeavored to amend its rent control ordinance to make it more efficient and expeditious. If Clovis engages, however, in further needless delay, then a writ of mandate to the trial court may legitimately request that the court intervene to set the proper rental rates, and the city may be liable for section 1983 damages.

This standard is similar to the rule we articulated in the takings contexts in Landgate v. California Coastal Com. (1997) 17 Cal.4th 1006 [73 Cal.Rptr.2d 841, 953 P.2d 1188]. We held in that case that a delay in development caused by a government agency’s mistaken assumption of jurisdiction over a lot line adjustment was not a temporary taking of property under the Fifth and Fourteenth Amendments to the United States Constitution. We evaluated the Coastal Commission’s action against the standard that a denial of the development project that does not substantially advance a legitimate state interest constitutes a taking of property (see Monterey v. Del Monte Dunes at Monterey, Ltd. (1999) 526 U.S. 687, 704-705 [119 S.Ct. 1624, 1636, 143 L.Ed.2d 882]), and found that the Coastal Commission’s actions, although erroneous, did in fact advance such an interest by contributing to the goals of coastal protection with which it was charged. (Landgate, at pp. 1023-1024.) We further held that the agency’s legal error was not sufficient to constitute constitutional error, and that the latter would be implicated only if the agency’s action was “so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development project before it.” (Id. at p. 1024.) We also held that “[t]he proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter.” (Id. at p. 1022.) So too, in the case of substantive due process, evidence of deliberate flouting of the law is generally to be gleaned from the fact that a government agency’s actions substantially and unreasonably diverged from clear legal rules, as the cases cited in the text immediately following illustrate.

Other courts have found substantive due process violations by municipal regulators when it is clear from the record that the decision was motivated by economic conflict of interest or political animus rather than any legitimate governmental interest. (See DeBlasio v. Zoning Bd. of Adjustment (3d Cir. 1995) 53 F.3d 592, 601-602; Brady v. Town of Colchester (2d Cir. 1988) 863 F.2d 205, 215-216; but see Rivkin, supra, 671 A.2d at pp. 576-577 [blatant bias of *1036 one member of rent control board may violate state law but does not implicate substantive due process].) Without deciding whether the substantive due process standards enunciated or implicit in these cases are correct, we note that no such conflict of interest or political animus is alleged in the present case.

The Gallands also cite Sierra Lake Reserve v. City of Rocklin (9th Cir. 1991) 938 F.2d 951 (Sierra Lake Reserve), vacated in part (1993) 987 F.2d 662, for the proposition that arbitrary government conduct by itself can support a substantive due process violation. In that case, a rent increase was delayed by little over a year due to various procedural obstacles. (938 F.2d at pp. 953-954.) Most of the opinion focused on a reaffirmation of the court’s doctrine that mobilehome rent control as commonly manifested in California was a physical taking of property, a doctrine repudiated by the United States Supreme Court in Yee v. Escondido, supra, 503 U.S. 519. The court’s brief discussion of substantive due process concluded that, from the facts alleged in the complaint, “[i]t is well within the realm of possibility that plaintiff could establish that the City’s actions in processing the applications were wrongful or arbitrary,” and therefore a basis for a substantive due process claim. (Sierra Lake Reserve, supra, 938 F.2d at p. 958.) Insofar as Sierra Lake Reserve can be taken to stand for the proposition that wrongful or arbitrary government action is per se a basis for a substantive due process claim, we believe it is contrary to the principle recently clarified in United States Supreme Court and other cases discussed above, that only egregious conduct by government agencies can give rise to such claims.

The dissent, inappropriately analogizing to tort law, opines that the trial court’s measure of damages is correct. The dissent then concludes the above discussion is dicta, and the trial court is therefore free to impose on remand the same measure of damages that we here reject. (See dis. opn., post, at p. 1055.) Not so. We hold that although there may be some section 1983 damages owing based on the substantive due process claim, the trial court’s method of calculating them was incorrect for the reasons explained immediately above, and for that reason remand is necessary. Therefore, our conclusion that the trial court was incorrect in its calculation of damages is in no sense dicta, but is necessary to our holding, and on remand the court must follow the deliberate flouting of the law standard discussed in this opinion.

The dissent appears to argue that landlords subject to rent control should be able to sustain a lighter burden in prosecuting a section 1983 action than other civil rights plaintiffs, proving only burdensome or dilatory conduct on the part of the government regulator. There is no basis for such a “landlord exception,” nor does the dissent cite any section 1983 case in support of this exception. Alternatively, the dissent argues that the trial court should conclude that Clovis violated the deliberate flouting of the law standard because it failed to allow rent increases without undue burdens, contrary to Birkenfeld. For the reasons explained above, the question is not whether the Clovis rent control proceeding as applied to the Gallands conformed to the requirements set forth in Birkenfeld, but rather, if there was a lack of conformity, it amounted to ordinary government error or something more egregious amounting to a deliberate flouting of the law. The trial court must make this determination by looking concretely at Clovis’s particular actions towards the Gallands.

Clovis also claims there is no procedural due process violation because the Gallands were afforded an adequate state law postdeprivation remedy, i.e., a writ of mandate under Code of *1041 Civil Procedure section 1094.5, that eventually allowed them the requested rent increases. (See Zinermon, supra, 494 U.S. at p. 125 [110 S.Ct. at p. 983].) Because we determine there was no independent procedural due process injury, we need not address this question.